NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11311

COMMONWEALTH <u>vs</u>. MIGUEL ROMAN.

Hampshire.    September 5, 2014. - November 4, 2014.

Present: Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.

<u>Homicide</u>. <u>Practice, Criminal</u>, Agreement between prosecutor and
witness, Capital case, Conduct of prosecutor, Disclosure of
evidence, Discovery, Examination of jurors, Instructions to
jury, Interrogation of jurors, Jury and jurors, Mistrial,
Required finding, Speedy trial, Voir dire, Witness.
<u>Constitutional Law</u>, Jury. <u>Evidence</u>, Bias of government
witness, Credibility of witness, Immunized witness.
<u>Witness</u>, Bias, Credibility, Immunity. <u>Jury and Jurors</u>.

<u>Indictments</u> found and returned in the Superior Court
Department on February 18, 2010.

A motion to dismiss was heard by <u>Richard J. Carey</u>, J.; a
renewed motion to dismiss was considered by <u>Cornelius J.
Moriarity, II</u>, J.; and the cases were tried before <u>Constance M.
Sweeney</u>, J.

<u>Donald A. Harwood</u> for the defendant.
<u>Jane Davidson Montori</u>, Assistant District Attorney, for the
Commonwealth.

SPINA, J. The defendant was convicted of deliberately

premeditated murder and possession of a class B substance. On

appeal he asserts error in (1) the denial of his motion for a required finding of not guilty; (2) the denial of his motion to dismiss based on Mass. R. Crim. P. 36, as amended, 422 Mass. 1503 (1996) (rule 36); (3) the denial of his motion to dismiss for delayed disclosure; (4) the judge's failure to declare, sua sponte, a mistrial based on alleged jury tampering; and (5) the judge's instruction pursuant to Commonwealth v. Ciampa, 406 Mass. 257 (1989).  The defendant also seeks relief under G. L. c. 278, § 33E.  We affirm the convictions and decline to exercise our authority under G. L. c. 278, § 33E, to reduce the conviction of murder to a lesser degree of guilt or order a new trial.

1.  Background.  The jury could have found the following facts.  Shortly before midnight on January 28, 2010, Angel Gonzalez (Angel) called the defendant on his cellular telephone to arrange a purchase of cocaine.  Angel and Luis Soto then drove to a night club in Holyoke where the defendant sold them cocaine.  They traveled in a grey four-door 2006 Nissan Altima owned by Soto's girl friend.  They then drove to a bar in Holyoke, ingesting the cocaine en route.

At about 12:56 A.M. on January 29, Angel's mother called Angel on his cellular telephone and told him that the victim was at the Holyoke Medical Center and needed a ride.  Soto, Angel, and Angel's brother Felipe left the bar in the Altima.  They

drove to the hospital and went inside to get the victim. The four men then returned to the bar. After about one hour they all left together. Angel called the defendant on his cellular telephone to arrange another purchase of cocaine. Angel's cellular telephone records showed three calls that connected with the defendant's cellular telephone between 1:30 A.M. and 1:52 A.M. They drove to the night club to meet the defendant. Angel and the victim got out of the car and went inside the club. When they returned, the defendant was with them and the three men entered the Altima.

Soto was driving; Angel was in the front passenger seat; the defendant sat behind Soto; Felipe was behind Angel; and the victim sat between the defendant and Felipe. The defendant told Soto to drive. They proceeded down High Street. The defendant directed Soto to turn right onto Essex Street. The defendant pulled out a handgun and shot the victim twice in the left rear side of his head. Soto stopped the car and shifted into the "park" position. Felipe got out of the car and ran toward High Street. Angel got out of the car and stood nearby for a short time before running toward High Street. Soto was the third to get out of the car. He hesitated because he was concerned about abandoning his girl friend's car, but then he left and ran toward High Street.

The defendant was the last person to get out of the Altima. He walked around the rear of the car, opened the rear passenger's side door and fired a third shot into the victim's right temple. He then got into the driver's seat of the Altima and sped off. The defendant turned onto Newton Street where he stopped and dumped the victim's body in the road. In the meantime, Felipe, Angel, and Soto made their way to Sam's Food, a nearby store on High Street. The defendant called Angel's cellular telephone at 2:04:07 A.M. The call connected for forty-four seconds. The Altima, driven by the defendant, arrived at Sam's Food store shortly thereafter. The defendant left the car there, and left the scene himself. The others then drove away in the Altima. Soto turned himself in to police the next day.

2. Motion for required finding of not guilty. The defendant argues that the evidence was not sufficient to convict him and that the judge erred in denying his motion for a required finding of not guilty. He contends that Felipe and Soto, who testified pursuant to cooperation agreements[1] and whose

---

[1] Angel Gonzales invoked his privilege against self-incrimination in the presence of the jury, at the request of the defendant, and did not testify. Without question, the prosecutor could not have called Angel to invoke his privilege against self-incrimination in the presence of the jury. The defendant had no right to proceed in this manner. See Commonwealth v. Rosario, 444 Mass. 550, 557-560 (2005); Commonwealth v. Fisher, 433 Mass. 340, 350 (2001); Commonwealth v. Hesketh, 386 Mass. 153, 157 (1982). There was no perceptible

murder indictments had been nolle prossed before the defendant's trial, gave "perjurious" and "uncorroborated" testimony that was legally insufficient to support a conviction.

He further contends that the evidence "conclusively demonstrate[d]" that Felipe was the only person in the car positioned to fire a bullet into the right temple of the victim, who was sitting immediately to his left.  In this regard he cites the testimony of Soto, who heard only one shot fired in the car, then turned and saw the victim falling forward.  The defendant reasons that this single shot, the only shot Soto heard in the car, must have been the one fired into the victim's right temple.  He further cites the testimony of Barbara St. Amand, a witness who looked out of her apartment window on Newton Street after hearing a car come to a screeching stop. She saw one man wearing a black hooded jacket, the same type of clothing worn by Felipe, go to the rear passenger's side of the car and pull something out.  The man then entered the car through the door behind the driver, and the car sped away.  The defendant contends that St. Amand's testimony establishes that two people were involved in the killing -- the driver of the car, Soto, and his rear driver's side passenger, Felipe.

---

prejudice to the defendant.  Indeed this evidence allowed the defendant to buttress his theory that Luis Soto and Felipe Gonzales killed the victim.

The defendant asserts that there was no evidence that he had a motive to kill the victim and, by contrast, that Angel and Felipe went to see the victim about one week before the killing to settle a dispute over a large sum of money that the victim owed Felipe and Angel. The victim was not at his apartment but a brother of Angel and Felipe took a valuable necklace from the victim's girl friend as payment. When the victim learned what had happened he telephoned Angel and told him he was "going to kill him and fuck him up."

When reviewing the denial of a motion for a required finding of not guilty at the close of the Commonwealth's case, "the critical inquiry . . . must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [The] question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). In developing his argument, the defendant largely has marshaled the evidence in the light most favorable to himself. We reject the defendant's approach. The jury were not required to accept all the testimony of a witness, for example, St. Amand; nor are we. When deciding the denial of a motion for

a required finding of not guilty, we consider the evidence in the light most favorable to the Commonwealth. In addition, the absence of evidence of motive is not material to our inquiry. The Commonwealth is not required to prove motive. See Commonwealth v. Brooks, 422 Mass. 574, 581 (1996).

Soto testified that as they were driving he heard a "detonation" and stopped the car. He turned around and saw the victim falling forward, and he saw the defendant holding a small black gun pointed at the victim's head. There was evidence from which the jury could infer that Soto heard only one shot because he experienced ringing in his ears after the detonation.

Video recordings from security cameras located at Essex and High Streets, Newton and Cabot Streets, Sam's Food store, and Holyoke Medical Center were admitted in evidence and shown to the jury. The video recording from the Holyoke Medical Center showed Soto, Felipe, and Angel inside the hospital between 12:56:47 A.M. and 12:57:42 A.M. on January 29, where they earlier had picked up the victim. It also showed the Altima in the parking lot.

The video recording from the security camera at Essex and High Streets showed the Altima stopped in the road. A person in the rear passenger's side seat could be seen getting out of the car and running toward High Street. That person was followed by a person in the front passenger's side seat, and then the

driver. Those three people could be seen running toward High Street. The next person to step out of the car was a person in the rear driver's side seat. He walked around the rear of the car to the rear passenger's side door, opened it, and leaned inside for about thirteen seconds. That person then backed away from the car and walked around the rear of the car toward the driver's side. The person entered the car through the driver's door and drove away. The video tape indicated this took place between about 2:02:22 A.M. and 2:02:56 A.M. on January 29, 2010.

Soto's testimony that he, Felipe, and Angel met outside Sam's Food store shortly after they fled from the Altima was corroborated by the video recording from the security cameras outside and inside Sam's Food store. The video recording from the front door area showed the three men as they arrived at the store, variously between 2:04:02 A.M. and 2:04:17 A.M. on January 29. The video recording from inside the store showed Angel and Soto inside the store, and it later showed Angel and Felipe talking at the front door. These video recordings corroborated Soto's testimony that he, Felipe, and Angel had made their way on foot to Sam's Food store.

The video recordings from the security cameras outside the front and at the rear parking lot at Sam's Food store showed the Altima turning right onto High Street from Cabot Street and then approach the front door area of the store at 2:04:18 A.M. The

front door video recording showed Angel talking on his cellular telephone. Cellular telephone records of Angel and the defendant indicate that at this same time the defendant called Angel's cellular telephone, and their cellular telephones were connected for forty-four seconds, beginning at 2:04:07 A.M. on January 29. The jury could have inferred from this evidence that Angel was talking to the defendant on his cellular telephone and told him that Soto, Felipe, and Angel were at Sam's Food store and that the defendant should return the Altima to them at that location.

The period that elapsed from the time the Altima stopped on Essex Street, 2:02:22 A.M., until the Altima arrived at Sam's Food store where Soto, Angel, and Felipe were waiting, at 2:04:18 A.M., was one minute and fifty-six seconds. The inference that Soto, Angel, and Felipe were the three figures who fled from the Altima on Essex Street, and the corresponding inference that the defendant drove the Altima from Essex Street to Sam's Food store, given the brief time span involved, was extremely powerful. There would only have been enough time for the convergence of Soto, Angel, Felipe, and the Altima at Sam's Food store by 2:04:18 A.M. if events had occurred as Soto and Felipe had testified. The defendant drove the Altima down two streets of a single city block (Newton and Cabot) to Sam's Food

store, while Soto, Angel, and Felipe ran along the other two streets of the same city block (Essex and High) to the store.

Although the identity of the various occupants of the car could not be ascertained from the Essex and High Streets video camera images, the video recording (in tandem with the Sam's Food video recording) corroborated Soto's testimony concerning their movement based on where they sat in the Altima.  Based on this evidence the jury could have found that Soto was the driver, that Angel was the front passenger, and that Felipe was the right rear passenger, all of whom fled, and that the defendant was the left rear passenger who walked over to the rear passenger's side door, opened it and leaned inside, and then drove the car away.

Deoxyribonucleic acid (DNA) evidence indicated that the victim's DNA matched the single-source DNA profile obtained from a blood stain on the defendant's right boot,[2] and the major-source DNA profile obtained from the edge of the defendant's right jacket pocket.[3]  The victim's DNA also matched the major

_____

[2] The probability of a deoxyribonucleic acid (DNA) profile match here from a randomly selected unrelated individual is about one in 136.8 trillion in the Caucasian population, one in 10.27 quadrillion in the African-American population, one in 1.036 quadrillion in the Hispanic population, and one in 1.647 quadrillion in the Asian population.

[3] The probability of a DNA profile match here from a randomly selected unrelated individual is about one in 9.881 billion in the Caucasian population, one in 238.5 billion in the African-American population, one in 48.26 billion in the

profile of a blood stain on the Altima's headliner (roof interior).[4]

In addition, transfer stains of human blood were found on the driver's door, the gear shift, the steering wheel, the rear view mirror, and the emergency brake of the Altima. From this evidence the jury could infer that the defendant transferred the victim's blood from his hands when he closed the driver's door, held the steering wheel, adjusted the rear view mirror, and moved the gear shift into drive. The jury also could infer that the defendant stepped in the victim's blood when he removed his body from the Altima. Human blood stains were found on the back side of the fourth and fifth fingers of the right-hand glove recovered from the defendant. None of these blood stains was tested for DNA. The jury could have inferred that the blood was the victim's, which sprayed back onto only two fingers of the glove exposed at the time the defendant fired two shots into the back of the victim's head at close range.

The defendant made a statement to police in which he denied knowing the victim and denied being in the Altima in the early

---

Hispanic population, and one in 115.7 billion in the Asian population.

[4] The probability of a DNA match here from a randomly selected unrelated individual is about one in 136.8 trillion in the Caucasian population, one in 10.27 quadrillion in the African-American population, one in 1.026 quadrillion in the Hispanic population, and one in 1.647 quadrillion in the Asian population.

morning hours of January 29. He also denied owning a gun. However, police recovered a gun cleaning kit from the defendant's apartment.

A medical examiner testified that the victim had sustained three gunshot wounds to the head. Two were on the left rear side, almost on top of each other; a third was on the right temple. She opined that at least one of the left rear wounds and the right temple wound were fatal.

Soto and Felipe heard one gunshot while inside the Altima, and they heard a second gunshot as they were making their way to Sam's Food store. St. Amand also thought that she heard two shots. A shell casing was found in the vicinity where the Altima stopped on Essex Street. Although the murder weapon was not found, a ballistics expert opined that the gun used to kill the victim was a Jennings Bryco model J22 semiautomatic pistol. This is a .22 caliber firearm similar to the gun Soto testified that he saw the defendant holding after he heard the first shot. This type of gun is very loud and is capable of firing shots in rapid succession, thus explaining how two projectiles could be nearly on top of one another, and why Soto and Felipe experienced ringing in their ears, and were unable to discern that two shots had been fired when they were inside the car. It also is consistent with a shell casing being ejected from the gun where it was recovered on Essex Street after the defendant

opened the right rear door of the Altima and fired one shot into the victim's right temple.

The evidence, taken in the light most favorable to the Commonwealth, was sufficient to support a conviction of deliberately premeditated murder. The defendant fired two shots at close range into the back of the head of the victim, which alone, is sufficient to support a conviction of deliberately premeditated murder. See Commonwealth v. Coleman, 434 Mass. 165, 168-169 (2001). He then went around the other side of the car, opened the rear passenger's side door, and fired a third shot into the right temple of the victim. There was no error in the denial of the defendant's motion for a required finding of not guilty.

3. Speedy trial. On September 20, 2011, the defendant filed a motion to dismiss, pursuant to Mass. R. Crim. P. 36 (b), alleging the denial of his right to a speedy trial. The motion was denied on October 31, 2011, by a judge who was not the trial judge. "Under rule 36, if a defendant is not 'tried within twelve months after the return day,' he . . . is entitled upon motion to a dismissal of the charges." Commonwealth v. Denehy, 466 Mass. 723, 729 (2014), quoting Mass. R. Crim. P. 36 (b) (1) (C), (D). Because the return day in this case was March 2,

2010, the day of arraignment,[5] and more than one year had passed before he filed his motion to dismiss under rule 36, on September 20, 2011, the defendant established a prima facie violation of the rule. See Denehy, supra. The burden shifts to the Commonwealth to justify the delay, which it may do by showing that a certain portion of the delay falls within one of the excluded periods provided by rule 36 (b) (2), or by a showing that the defendant acquiesced in the delay, or that he benefited from the delay. Id. A failure to object to a continuance or other delay constitutes acquiescence. Commonwealth v. Tanner, 417 Mass. 1, 3 (1994). The filing of a rule 36 motion tolls the running of the time within which a defendant must be brought to trial. Barry v. Commonwealth, 390 Mass. 285, 294 (1983). For purposes of a rule 36 calculation of excludable periods, the docket and the clerk's log are prima facie evidence of the facts recorded therein. Id. at 289. The period from March 2, 2010, to September 20, 2011, is 567 days. The Commonwealth was required to account for at least 202 days.

The original pretrial hearing date, August 24, 2010, was continued to November 16, 2010, by agreement of the parties, as reflected in the clerk's log. This period, eighty-four days, is excludable by reason of the defendant's acquiescence in the

---

[5] See Mass. R. Crim. P. 2 (b) (15), as amended, 397 Mass. 1226 (1986).

delay.  See Commonwealth v. Spaulding, 411 Mass. 503, 504 (1992).

The pretrial hearing was continued again from November 16, 2010, to December 13, 2010; then to January 11, 2011; and then to February 16, 2011.  The defendant voiced no objection or opposition to these continuances and thus is deemed to have acquiesced in them, regardless whether the continuances were ordered by the court or the subject of an agreement of the parties.  See Denehy, supra at 731.  The periods involved comprise ninety-two days that are excludable.

On February 16, 2011, the defendant expressly agreed to a trial date of September 12, 2011, thus acquiescing in a period of 208 days.  This amount is excludable.

The Commonwealth filed a motion on July 20, 2011, to continue the trial date.  The motion was allowed, and the trial was continued to October 14, over the defendant's objection. The defendant's original acquiescence in the setting of the original trial date of September 12, 2011, is unaffected by the continuance over his objection.  However, the time between September 12 and September 20, 2011, is chargeable to the Commonwealth.  The total amount of excludable time between March 2, 2010, and September 20, 2011, was 384 days, leaving 183 days chargeable to the Commonwealth.  This was well within the

one-year requirement of rule 36. The motion properly was denied.

4. _Renewed motion to dismiss_. The defendant filed a renewed motion to dismiss on December 2, 2011, alleging both a violation of rule 36 and a claim of prosecutorial misconduct in the delayed production of discovery. Circumstances that occurred between September 20, 2011, the date the defendant filed his first motion to dismiss and December 2, 2011, the date he filed his renewed motion are relevant to our discussion.

The defendant's first motion to dismiss was heard on September 28, 2011, by a judge who was not the trial judge. It was taken under advisement and denied on October 31, 2011. In the meantime, the defendant filed a motion to continue the October 14 trial date because his rule 36 motion was under advisement. The trial was continued to November 17, 2011. On November 15, after the rule 36 motion was denied, the Commonwealth served on the defendant about 300 pages of additional discovery, plus four "CDs" containing the videos from the various security cameras. On November 16, the defendant orally moved to continue the trial because time was needed to review the additional discovery. A second judge, not the trial judge, continued the trial to December 15, 2011, and charged the time from November 16 to December 15 to the Commonwealth. The defendant filed his renewed motion to dismiss on December 2.

The motion was denied by the second judge on December 13.  The defendant asserts error in the denial of his renewed motion to dismiss.

We first address the rule 36 claim.  The period from September 20, 2011, to September 28, 2011, is a reasonable time in which to schedule a hearing on the rule 36 motion, and is excludable for that reason.  Moreover, the rule 36 clock was tolled by reason of the filing of the motion.  See Barry, 390 Mass. at 294; Mass. R. Crim. P. 36 (b) (2) (A) (v) (period between request for hearing and conclusion of hearing is excludable).  In addition, a period of not more than thirty days during which the motion was taken under advisement by the first judge is excludable.  See rule 36 (b) (2) (A) (vii).  Thus, the period from September 20 to October 28, or thirty-eight days, is excludable.  The three additional days taken by the first judge in deciding the first rule 36 motion are not excludable.

The period from November 1 to November 16, 2011, is excludable because the defendant had moved to continue the trial from October 14 to November 17.  On November 16 the second judge continued the trial to December 15, 2011, and charged the time to the Commonwealth.  Thus, sixteen days are excludable from the period between November 1 and December 15.

The period of time from September 20 to December 2, 2011, the date the renewed motion to dismiss was filed, was seventy-

three days, of which fifty-four days are excludable.  The total time from arraignment to December 2, 2011, was 640 days, of which the Commonwealth had to account for 275 days.  A total of 438 days are excludable.  There was no violation of rule 36.

We turn to the claim of prosecutorial misconduct.  Rule 36 (c) provides that

> "[n]otwithstanding the fact that a defendant is not entitled to a dismissal under subdivision (b) of this rule, a defendant shall upon motion be entitled to a dismissal where the judge after an examination and consideration of all attendant circumstances determines that:  (1) the conduct of the prosecuting attorney in bringing the defendant to trial has been unreasonably lacking in diligence and (2) this conduct on the part of the prosecuting attorney has resulted in prejudice to the defendant."

Rule 36 (c) is consistent with constitutional principles.  See generally Barker v. Wingo, 407 U.S. 514 (1972).

There was evidence that the delays were caused in part by the laboratory assigned to perform the DNA tests, by failure of the police to deliver reports and witness statements to the district attorney in a timely manner, and by the failure of the district attorney's office to provide timely disclosure of certain cellular telephone records.  Some of this came to light at the July 20, 2011, hearing on the Commonwealth's motion to continue the September 12 trial date.  Counsel for all defendants were present, and at one point counsel for Soto stated, without objection or opposition or expression of disassociation from other counsel, including trial counsel for

the defendant (who is not appellate counsel), "[W]e should have acted sooner. . . . But having said that, the Government also bears some of the brunt of the responsibility here. And the laboratory as well. So I think all of us are culpable in equal degrees." The second judge rejected the claim of prosecutorial misconduct. He found that the belated discovery disclosure was "not intentional but rather the result of oversight," and that the defendant had not shown prejudice. Accordingly, the defendant has not shown that the second judge erred. The renewed motion to dismiss properly was denied.

5. _Mistrial_. The defendant urges us to invoke our powers under G. L. c. 278, § 33E, and conclude that the trial judge should have declared a mistrial sua sponte with respect to alleged jury tampering by members of the victim's family.

Juror no. 14 approached a court officer on the seventh day of trial and informed him of troublesome conduct by certain individuals who had been in the court room. As a result, the judge conducted an individual voir dire of the jury at the beginning of the seventh day of the trial. The judge asked each juror if he or she had heard any comments from members of the audience, whether the juror had had any contact with members of the audience, and whether the juror had heard other jurors express any concerns about members of the audience. Her final question to each juror asked whether the juror could remain fair

and impartial.  All jurors indicated that they could remain fair and impartial.  Three jurors heard comments or observed conduct from members of the audience, as summarized below.

While waiting for an elevator juror no. 3 heard a young, brown-haired woman (later identified as the defendant's aunt) who had been in the audience say to a group of people with whom she was talking, "If they send him upstate, he'll be dead." Juror no. 3 indicated that this did not affect his ability to remain fair and impartial.

While walking down a corridor in the court house, juror no. 14 heard a woman who had been a member of the audience say to a group of nonjurors, "Every one of those fucking jurors . . . ," and then abruptly stop speaking when she saw juror no. 14 approaching.  Juror no. 14 saw this same woman (later identified as the same aunt) look at a group of jurors in the parking lot, and then spit on the ground.  Juror no. 14 found this person's conduct "atrocious" and "vulgar," but the juror assured the judge that she could remain "fair and impartial."  Juror no. 14 spoke to other jurors.  She and other jurors speculated whether their license plates could be used to locate them, but this speculation was not based on anything that a member of the audience said or did.  She expressed concerns that at the end of each day jurors and spectators left the court house at the same time.

Juror no. 16 was in an elevator with a group of people when one woman who had not been in the audience asked, "What's going on with the trial?" A blonde-haired woman who had been in the audience (later identified as the defendant's mother) said, "None of her fucking business what's going on with the trial." Juror no. 16 was not affected by the incident.

The judge asked the prosecutor to identify the women described by jurors nos. 3, 14, and 16. The blonde-haired woman was identified as the victim's mother; the woman referenced by jurors nos. 3 and 14 was identified as an aunt of the victim. The judge excluded them from the court room for the balance of the trial. The judge characterized the conduct of the victim's aunt as "potential juror tampering" and said she would refer the matter to the Attorney General.

The prosecutor requested that juror no. 14 be excused. The defendant objected, and the judge denied the prosecutor's request. The judge determined that based on the voir dire, juror no. 14 remained "fair and impartial."

"If, during trial or jury deliberations, the judge is advised of a claim of an extraneous influence on the jury, he or she is to first 'determine whether the material . . . raises a serious question of possible prejudice.' Commonwealth v. Jackson, 376 Mass. 790, 800 (1978). If 'a juror indicates exposure to the extraneous material in question, an individual

voir dire is required to determine the extent of that exposure and its prejudicial effect.' Commonwealth v. Tennison, 440 Mass. 553, 557 (2003). Because the judge 'is in the best position to observe and assess the demeanor of the juror[s] on voir dire . . . [t]he determination that [a] juror was unaffected by extraneous information is within the sound discretion of the trial judge.' (Citation omitted.) Id. at 560." Commonwealth v. Meas, 467 Mass. 434, 451 (2014), cert. denied, U.S. Supreme Ct., No. 13-10630 (Oct. 6, 2014). Here, the judge followed the correct procedure and was entitled to rely on the jurors' assertions of impartiality, and on her observations of them during voir dire in assessing whether they could remain fair and impartial. We also are mindful that experienced trial counsel voiced no objection. The defendant has failed to demonstrate any "solid evidence of a distinct bias," Commonwealth v. Bryant, 447 Mass. 494, 500 (2006), quoting Commonwealth v. Leahy, 445 Mass. 481, 499 (2005), or that the judge otherwise abused her discretion. There was no error.

6. The Ciampa instruction. The defendant contends that the judge's instruction concerning the manner in which the jury should consider the testimony of a cooperating witness was error. In particular, he argues that the judge did not "adequately focus the jury's attention on the incentives that

could have influenced [Soto's and Felipe's] testimony." Ciampa, 406 Mass. at 263-264. In addition, he argues, the judge failed to instruct the jury that "the government did not know whether [Soto and Felipe] were telling the truth]." Id. at 264. See Commonwealth v. Meuse, 423 Mass. 831, 832 (1996). There was no objection to the jury instruction. We review to determine if there was error, and, if so, whether it created a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

Trial counsel began his cross-examination of both Soto and Felipe with a discussion of the unredacted terms of their cooperation agreements and the nolle prosse filed in the murder case against each witness. Both Soto and Felipe still had outstanding indictments for accessory after the fact of murder. He elicited from both witnesses that they had spent twenty-one months in custody in lieu of bail, that conditions of their incarceration were stressful, and that the Commonwealth was "totally in charge" of whether their testimony was in breach of their cooperation agreements. The decision to cooperate with the Commonwealth was not difficult for either man, even though for Felipe it meant he might have to testify against his brother Angel. Trial counsel also stressed the fact that prior to their being held, police interrogators repeatedly told them they did not believe their early statements, implying that the

Commonwealth was looking for specific testimony and until it was forthcoming they would remain in jail.

Toward the end of his closing argument trial counsel forcefully argued that Soto and Felipe had made what were essentially the deals of a lifetime. He argued that the case came down to whether the jury believed Soto and Felipe. He mocked the cooperation agreements, claiming,

> "the Commonwealth controls what [I] would argue to you is a puppet. [The Commonwealth] control[s] the strings . . . . The agreement that they signed to get out of jail . . . says, all the rights are with the government to determine what we really think about your testimony. . . . Read it in detail. Did [they] have any choice? Did either one of them have any choice? They were walking away from murder in the first degree, they were walking out of jail after 21 months. . . . I think I recorded that [they] said I'm just here to tell the truth. I think I recorded that [they] said I'm just here to tell the truth 32 times. I guess that's for you ladies and gentlemen of the jury to decide whether or not [they were] there to tell the truth, or to fulfill the obligations of [their] cooperation agreement. . . . Well, the cooperating individuals are cooperating for only one reason. They're cooperating because they're afraid that they'll go back to being charged with murder in the first degree." (Emphasis added.)

The prosecutor never mentioned the cooperation agreements in his closing argument. His argument carefully and methodically focused upon the importance of the security camera video recordings and the forensic evidence, and how they corroborated the testimony of Soto and Felipe. His argument rested on painstaking attention to detail. He never suggested that the Commonwealth had superior knowledge that the witnesses

were telling the truth; rather, he stated that it was the jury's function to determine the truth.

The trial judge focused upon the fact that trial counsel wanted to offer the cooperation agreements with nothing redacted. Counsel made it clear that he wanted nothing redacted. After Soto's cooperation agreement was admitted in evidence the judge instructed the jury, "[N]o matter what agreement[s] exist or do not exist between the Commonwealth and any witness in the case, you are the only ones who determine[] the truth in the case. Period. You are the only ones, no one else, who determine the truth and the facts in the case consistent with the burden of proof and presumption of innocence as discussed before." After Felipe's cooperation agreement was admitted in evidence the judge instructed the jury, "I told you this yesterday when we had the same issue with another witness, Mr. Soto. The instruction remains the same, but now with respect to this witness. Any reference in any agreement to an agreement being based on a person telling the truth, I underscore to you the Commonwealth does not determine what the truth is. The jury determines what the truth is, based on the evidence that they determine to be credible."

In her final general instructions, the judge told the jury that when assessing a witness's credibility they could consider whether the witness has an interest in the outcome of the case,

any motive or reason they may have in testifying, and the witness's appearance and demeanor. She later instructed the jury that with respect to the testimony of Soto and Felipe, who were alleged accomplices, they must bring "heightened scrutiny and care in evaluating and analyzing the testimony of those witnesses." She further instructed, if a witness "has a cooperation agreement with the Commonwealth . . . you must scrutinize that witness's testimony with that high, high degree of scrutiny. . . . [W]ith respect to those so-called cooperation agreements, I remind you that promises to tell the truth within cooperation agreements are irrelevant. The jury determines what the truth of the matter is in the case, no one else."

In Ciampa, we pointed to specific deficiencies in the judge's instructions. We said that language in a cooperation agreement to the effect that the agreement was "contingent upon the truthfulness of [the cooperating witness]" should be redacted "on request" by a defendant (emphasis added). Ciampa, 406 Mass. at 262. See Mass. G. Evid. § 1104(c) (2014). Here, not only was there no request for such redaction, but also trial counsel specifically indicated he did not want anything redacted. This language went to the heart of the defense. Trial counsel wanted the jury to understand that the Commonwealth brought tremendous pressure to bear on Soto and

Felipe until they came forward with a story that the Commonwealth wanted them to tell -- and that truth played no part in it.

We also said in Ciampa that a judge should warn the jury that "the government did not know whether [the cooperating witness] was telling the truth." 406 Mass. at 264. However, failure to so instruct, standing alone, is not reversible error. See Meuse, 423 Mass. at 832. It is only where the prosecutor has vouched for the witness or suggested having special knowledge by which he or she can verify the witness's testimony that such an instruction must be given to avert reversible error. See id.; Ciampa, 406 Mass. at 266. Here, the prosecutor never vouched for Soto or Felipe. Nor did he suggest that he had special knowledge by which to determine that they were telling the truth. There was no error in the failure to give such an instruction.

Finally, in Ciampa we said that a judge should "focus the jury's attention on the particular care they must give in evaluating testimony given pursuant to a plea agreement that is contingent on the witness's telling the truth." 406 Mass. at 266. We also said that "[w]e do not prescribe particular words that a judge should use" in this regard. Id. The judge did what minimally was required under Ciampa given the circumstances presented at the defendant's trial. See Mass. G. Evid.

§ 1104(f) (2014).  She also reinforced the importance of such inquiry by instructing the jury that they should scrutinize the testimony of Soto and Felipe with great care by virtue of their being alleged accomplices, something we encourage but do not require.  See Commonwealth v. Thomas, 439 Mass. 362, 372 (2003).  There was no error.

7.  Review under G. L. c. 278, § 33E.  We have reviewed the transcripts, the briefs, and the entire record, and we discern no reason to exercise our power under G. L. c. 278, § 33E, to reduce the conviction of murder to a lesser degree of guilt or order a new trial.  The manner in which this case was prosecuted, defended, and judged was exemplary.  In the final analysis, this case is a testament to the power of circumstantial evidence.

Judgments affirmed.