NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11458

COMMONWEALTH  vs.  EMMANUEL DaSILVA.


Suffolk.     December 5, 2014. - March 26, 2015.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Grand Jury.  Evidence, Grand jury proceedings,
     Testimony before grand jury, Prior misconduct, Hearsay,
     Relevancy and materiality, Impeachment of credibility,
     Exculpatory.  Witness, Impeachment.  Practice, Criminal,
     Capital case, Grand jury proceedings, Transcript of
     testimony before grand jury, Recording of proceedings,
     Argument by prosecutor, Instructions to jury.



Indictments found and returned in the Superior Court
Department on May 2, 2007.

The cases were tried before Frank M. Gaziano, J.


John F. Palmer for the defendant.
Dara Z. Kesselheim, Assistant District Attorney (Mark D.
Zanini & Julie Sunkle Higgins, Assistant District
Attorneys, with her) for the Commonwealth.


SPINA, J.  The defendant was a participant in a drive-by

shooting on February 13, 2007, in the Roxbury section of Boston.

The motive was revenge against David Evans for the shooting of a

family friend, "A.J.," and an assault on a family member. However, the targeted group of young men standing across the street from Evans's apartment at the time of the shooting had nothing to do with Evans. One member of the group was killed, and two were wounded. The defendant was convicted of murder in the first degree and various related offenses. On appeal the defendant asserts error in (1) the admission of the grand jury testimony of a Commonwealth witness; (2) the admission of evidence of prior bad acts; (3) the admission of evidence that the defendant refused to have his custodial interrogation recorded; (4) the admission of evidence of 911 calls received by a police dispatcher; (5) the admission of evidence concerning the course of the investigation and the role of the grand jury; (6) the prosecutor's impeachment of a defense witness with her failure to report exculpatory evidence to police; (7) the prosecutor's closing argument; and (8) the judge's decision declining to give a so-called Bowden instruction. See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). We affirm the convictions and decline the defendant's request that we grant relief under G. L. c. 278, § 33E.

1. Background. The jury could have found the following facts. We reserve other details for discussion of the particular issues.

A brief description of family relations is in order before we describe the events of February 13, 2007, that led up to the shooting later the same day.  A critical witness for the Commonwealth was Clarimundo DaSilva,[1] who is an uncle of the defendant and a brother-in-law of Joseph Gomes.  Clarimundo and Gomes's parents lived in the same apartment building on Langdon Street in Roxbury.  The building was owned by Gomes's parents. The defendant and Gomes lived at different addresses, but were frequent visitors.

At about 9 A.M. on February 13, 2007, Clarimundo's son Anthony arrived home and reported that someone with a gun was chasing him.  Clarimundo heard gunshots and telephoned the police.  An eyewitness saw a person chasing a dark-colored automobile down Langdon Street, shooting at it.  The person wore a red and white hooded sweatshirt.  When police officers arrived, they learned that the shooter had run into the DaSilva-Gomes apartment building.  After conducting a sweep of the building to determine if the shooter was inside, the police ordered all residents to leave the building while they obtained a search warrant.  During the execution of the warrant the officers recovered a .380 semiautomatic Mauser pistol, personal

---

[1] We refer to members of the DaSilva family by their first names.

papers in the name of "Joseph Gomes,"[2] and a red, white, and black sweatshirt. Five shell casings found in the street and sidewalk in front of the apartment building were determined to have been fired from the Mauser. In addition, a bullet and tire with a hole were recovered from a tire store, where Evans's black Buick LaCrosse, a rental vehicle, had been taken for a tire replacement in February, 2007. The bullet that was recovered had been fired from the Mauser.

Evans had a second rental vehicle at the time, a silver Nissan Maxima with New Hampshire license plates. The Nissan was seen several times in the vicinity of the apartment building during the day on February 13. Clarimundo told the defendant that people in the Nissan had pointed at him. The defendant and an unidentified third person who was with him told Clarimundo that the people in the Nissan were the people who had shot "A.J.," a friend of Anthony's.

Later that afternoon Clarimundo drove to pick up his daughter at school. The defendant accompanied him, and waited in the vehicle while Clarimundo went into the school. When Clarimundo and his daughter returned, the defendant had left. He returned a short time later, and he appeared scared. He told Clarimundo that he had seen the Nissan again on the way to the

---

[2] Joseph Gomes and his father have the same name. The papers recovered from the basement did not specify "Sr." or "Jr."

school, and said, "I don't want to stop . . . to wait for you with these crazy people around."

Clarimundo testified that the defendant and Gomes left Langdon Street together at about 6 P.M. on February 13. Clarimundo told police about the Nissan, and one officer recalled seeing it in the Langdon Street neighborhood at least twice during the day on that day.

Shortly after 6 P.M. on February 13, gunshots were fired from the passenger's side windows of a newer model silver Chevrolet Impala into a group of seven young men gathered on a sidewalk on Maywood Street in Boston. They had been standing near Evans's Nissan Maxima, which was parked across the street from Evans's apartment. One man was killed, and two were wounded. The man who was killed bore a strong resemblance to Evans. Police responded to two separate 911 calls made within one minute of the shooting. The first 911 call was received at 6:06 P.M. The dispatcher issued calls to respond. The second dispatch, at 6:07 P.M., included a partial description of the fleeing vehicle. At 6:16 P.M. the dispatcher heard on the police radio that a Chevrolet Impala was stopped on Savin Street, which runs parallel to Maywood Street. The driver of the vehicle was Gomes.[3] The sole passenger was the defendant.[4]

_____

[3] Gomes and the defendant originally were tried together. However, the defendant's trial counsel became ill and was unable

Two .38 caliber shell casings were recovered from the defendant's seat in the vehicle, and four .38 caliber shell casings were recovered from the floor in front of his seat. A seventh .38 caliber shell casing was recovered on Maywood Street at the scene of the shooting. All seven casings were determined to have been fired from the same gun. The defendant's fingerprints were found on a soda bottle on the floor area of his passenger seat. They also were found on a cigarette package on the floor in the rear seat area. No firearm related to the shooting ever was recovered.

A projectile recovered from a survivor of the shooting was determined to have been fired from a .38 or .357 caliber revolver. Another projectile was recovered from the kitchen of an apartment on Savin Street. The projectile entered through the kitchen window at the time of the shooting. The kitchen window faces Maywood Street and the vicinity of the shooting. That projectile was determined to have been fired from the same .38 or .357 caliber revolver. On February 13, an officer waiting for a tow truck to remove Gomes's Chevrolet Impala from Savin Street saw Evans's Nissan go by. He broadcast this

---

to continue with the trial. The defendant's motion to sever was allowed, and a mistrial was declared in his case. That trial then proceeded as to Gomes.

[4] Witnesses testified that there were three or four persons in the drive-by vehicle. No others were apprehended.

information over his radio.  The Nissan was stopped by police at about 7:45 P.M. on that day.  Evans was the front-seat passenger.

The defense was a combination of alibi and shoddy police work.  The defendant's father testified that his son was at home on Dennis Street when he arrived home from work at 12:30 P.M. on February 13, 2007.  His son left the home at approximately 12:45 P.M.  The father returned to work at 1:15 P.M.  The defendant's girl friend also lived with him on Dennis Street.  She testified that she returned home from work at about 5:30 P.M. on that day, and had dinner with the defendant, who was at home when she arrived.  At some point he left.  It was dark outside.  An investigator hired by the defense testified that he drove between the location of the Maywood Street shooting and the defendant's Dennis Street home following various routes at about 6 P.M.  In heavy traffic it took him a little over two minutes. He then drove from the Dennis Street home to Savin Street in the vicinity where the Impala had been stopped.  It took him under six minutes to cover that distance.  The investigator's testimony was offered to rebut the testimony of police officers who suggested that it would not have been possible for Gomes to have driven from the scene of the shooting to the defendant's home, picked him up, and then driven to the location on Savin

Street by 6:16 P.M. on February 13, when his Impala was stopped by police.

2. Clarimundo's grand jury testimony. The prosecutor impeached Clarimundo with his grand jury testimony after Clarimundo testified at trial that he did not see the defendant -- his nephew -- or talk to him during the afternoon or early evening of February 13, 2007. Clarimundo's grand jury testimony indicated that he saw the defendant and talked to him several times during that period of time. Moreover, Clarimundo's grand jury testimony provided the only evidence that the defendant knew of Evans, that he knew of Evans's connection to the Nissan, that he was aware of the shooting of A.J. and the events earlier in the day of February 13 at Langdon Street, and that the defendant and Gomes were together at about 6 P.M. -- shortly before the shooting. Clarimundo's grand jury testimony was admitted for its probative value under Commonwealth v. Daye, 393 Mass. 55 (1984). The defendant asserts error in the admission of Clarimundo's grand jury testimony as probative evidence. He contends that the use of the witness's grand jury testimony for probative purposes failed in multiple respects to meet the requirements of Daye.

Daye permits the probative use of a witness's grand jury testimony that is inconsistent with his or her trial testimony provided certain conditions are met. First, there must be an

opportunity for effective cross-examination of the witness at trial as to the accuracy of the grand jury testimony.  <u>Daye</u>, 393 Mass. at 73.  Second, the grand jury testimony must be the statement of the witness and not merely a confirmation or denial of an allegation by the interrogator, and the grand jury testimony must not be coerced.  <u>Id</u>. at 74.  See Mass. G. Evid. § 801(d)(1)(A) (2014).

As an initial matter the defendant argues that, under <u>Daye</u>, the judge was required to conduct a voir dire of Clarimundo before admitting his grand jury testimony for probative purposes.  There is no such requirement.  As we recently have noted, a voir dire often may be necessary, but it is not required where, as here, the direct and cross-examination of the witness adequately inform the decision of the trial judge.  See <u>Commonwealth</u> v. <u>Maldonado</u>, 466 Mass. 742, 755-756, cert. denied, 134 S. Ct. 2312 (2014).  As we will discuss shortly, where Clarimundo's trial testimony and his grand jury testimony were plainly contradictory, a voir dire was not necessary.  The judge here educated himself thoroughly with Clarimundo's grand jury testimony, and he followed Clarimundo's trial testimony keenly, at times interrupting the prosecutor before defense counsel could object.  Clarimundo was reminded of his grand jury testimony on both direct and cross-examination, and he was afforded the opportunity to explain any inconsistencies between

his trial testimony and his grand jury testimony.  There was no error.

The defendant maintains that Clarimundo's testimony before the grand jury was coerced and, therefore, inadmissible under Daye.  We disagree.  His grand jury testimony was developed largely through open-ended questions, and his answers generally were lengthy and rambling.  The judge found that Clarimundo said to the grand jury what he wanted to say.  Clarimundo's answers to questions were at times unresponsive or only loosely related to the questions put to him.  Although he had been summonsed, that alone does not amount to coercion.  See Commonwealth v. Beauchamp, 49 Mass. App. Ct. 591, 607 (2000).  The type of coercion contemplated by Daye does not include threats to seek contempt if the witness did not answer questions put to him or her, as occurred here.  The record does not indicate that Clarimundo had been pressured to inculpate his nephew or face contempt.  There is no suggestion that Clarimundo had been pressured to testify in a certain way.  See Daye, 393 Mass. at 74 n.20.  There was no error.

The defendant next argues that Clarimundo's testimony was not inconsistent with his grand jury testimony and that therefore Daye is not applicable.  See Mass. G. Evid. § 801(d)(1)(A)(i).  A judge has considerable discretion in deciding whether a witness's trial testimony and his or her

grand jury testimony are inconsistent under Daye. The inconsistency need not be a contradiction in plain terms. It is enough that the trial testimony "taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness" whom it is sought to contradict. Daye, 393 Mass. at 73 n.16, quoting Commonwealth v. West, 312 Mass. 438, 440 (1942). Here, the defendant complains that there were three instances where Clarimundo's grand jury testimony was not inconsistent with his trial testimony and therefore was admitted improperly.

In the first instance, Clarimundo testified at trial that the only family member he saw outside during the time police cleared the house was Gomes. He testified before the grand jury that while outside the house, he told the defendant that the Nissan drove by and people in the vehicle looked at them. This was a direct contradiction. It was enough that the judge could infer that where Clarimundo said he spoke to the defendant while outside the house, he also saw the defendant outside the house.

The second instance in which the defendant claims that Clarimundo's grand jury testimony was admitted for probative use in the absence of any inconsistency with his trial testimony concerned whether the defendant explained why he had left the vehicle when Clarimundo went inside the school to get his cousin. When asked at trial if the defendant offered any

explanation, Clarimundo said, "No." The prosecutor was allowed to introduce Clarimundo's grand jury testimony given in response to the question at the grand jury, "Where do you go when [the defendant] comes back?" Clarimundo's answer to that question was a rambling narrative that included the defendant's explanation for leaving the vehicle, namely, that he saw Evans's Nissan on the way to the school, and he "[didn't] want to stop . . . to wait for [Clarimundo] with these crazy people around." Clarimundo's grand jury testimony was in direct conflict with his trial testimony.

In the third instance where the defendant contends there was no inconsistency between Clarimundo's trial testimony and his grand jury testimony, we discern a direct conflict. At trial he testified that neither the defendant nor Gomes was present at Langdon Street during the afternoon or early evening of February 13, 2007. In contrast, he testified before the grand jury that both men left the Langdon Street premises together at about 6 P.M.

The defendant next argues that his statement to Clarimundo that he saw Evans's Nissan while they were driving to the school should not have been admitted because it was not a statement made under oath. See Mass. G. Evid. § 801(d)(1)(A)(ii). The argument is based on the fact that in his grand jury testimony Clarimundo was not describing the defendant's statement as

something the defendant said to him, but something Clarimundo told a police detective as what the defendant told him. This hypertechnical argument is unpersuasive, and it is entirely reasonable to understand that the testimony served a dual purpose: Clarimundo was describing both what the defendant told him and what he in turn passed along to police. In any event, the conversation between Clarimundo and the detective was conveyed to the grand jury under oath. We add that the parties agreed that this portion of Clarimundo's grand jury testimony could be admitted at trial.

The final argument as to Clarimundo's grand jury testimony was that its admission violated the defendant's constitutional rights of confrontation and due process under the Sixth and Fourteenth Amendments to the United States Constitution because he did not specifically acknowledge at trial that he made certain statements before the grand jury. See Crawford v. Washington, 541 U.S. 36, 68 (2004); Pointer v. Texas, 380 U.S. 400, 406 (1965). Clarimundo did not deny making the statements to the grand jury that were admitted in evidence. Although at times he claimed an inability to remember what he told the grand jury, the judge found that he was feigning memory loss. Clarimundo did not refuse to answer questions posed by defense counsel, who was able to fully probe Clarimundo's inconsistencies. We conclude that in these circumstances the

defendant had an opportunity to effectively cross-examine Clarimundo. There was no deprivation of due process or the right to confront and cross-examine the witness. See Commonwealth v. Maldonado, 466 Mass. 742, 754-755 (2014); Commonwealth v. Figueroa, 451 Mass. 566, 574-577 (2008).

3. Prior bad act evidence. The defendant maintains that the admission of the evidence of the shooting on Langdon Street during the morning of February 13, 2007, and related events through that afternoon was insufficient to support an inference of motive on the part of the defendant. The general rule involved here is that "evidence of uncharged criminal acts or other misbehavior is not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as 'common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive.'" Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006), quoting Commonwealth v. Marshall, 434 Mass. 358, 366 (2001). Whether the probative value of such evidence outweighs the risk of prejudice is a determination committed to the sound discretion of the trial judge. Commonwealth v. Horton, 434 Mass. 823, 827-828 (2001).

The evidence of motive here is very strong. The jury could have found that the defendant and Gomes sought revenge against Evans for shooting A.J. and chasing Anthony DaSilva. An unknown

friend or member of the family fired the Mauser pistol at Evans's Buick on the morning of February 13, 2007, puncturing a tire. The Mauser was traced to the Gomes family. When Evans's Nissan was seen stalking the neighborhood that day, the defendant and Gomes decided to deliver a preemptive strike and drove to Maywood Street where Evans lived, but killed the wrong person. Shell casings were found in the vehicle in which the defendant and Gomes were riding about ten minutes after the killing. There was a sufficient nexus between the Langdon Street incident, the defendant, and the Maywood Street shooting to support admission of the prior bad act evidence. There was no abuse of discretion.

4. _Defendant's refusal to have his statement tape recorded_. The defendant gave a statement to police in which he said he had gone with Clarimundo to pick up his cousin at her school. Clarimundo then drove him to his home on Dennis Street. Gomes came by to pick him up as it was getting dark. They set out to buy some liquor, but were pulled over by police. A female officer told him he was sitting on some shell casings or bullets. He told her he knew nothing about them. He was placed under arrest. The defendant had declined to have the interview recorded, and the jury were so informed, over objection. See _Commonwealth_ v. _DiGiambattista_, 442 Mass. 423, 447-448 (2004). The defendant argues that it was error to admit evidence of his

refusal to have his statement tape recorded, where defense counsel had explicitly advised the jury that the defendant did not intend to make an issue of either the voluntariness of his statement or the absence of a recording.  He contends that the only basis for admitting such evidence was to show consciousness of guilt or a fear that the recording would incriminate him.  We disagree.

Without any evidence of the defendant's refusal, the jury may have questioned the absence of a recording wholly apart from whether a DiGiambattista instruction were given.  The judge ruled that the Commonwealth was entitled to introduce evidence of the defendant's refusal to inform the jury that the police followed proper procedures.  See DiGiambattista, 442 Mass. at 448-449 ("permissible for the prosecution to address any reasons or justifications that would explain why no recording was made").  This is especially true here, where a cornerstone of the defense was shoddy police work.  There was no suggestion at trial that the defendant's refusal somehow should be held against him.  There was no error.

5.  Hearsay evidence in 911 calls.  A police dispatcher was allowed to testify about receiving the 911 calls concerning the shooting on Maywood Street.  She also was allowed to testify, over objection, that within ten minutes "after the shooting" she heard on the radio that a vehicle had been stopped in response

to her dispatches (emphasis added).  The defendant argues, as he did below, that this was inadmissible hearsay, offered for the truth of the matter.  He further argues that it was prejudicial because it minimized the likelihood that Gomes had picked him up after the shooting, a critical issue at trial.

The prosecutor attempted to correct the problem, and the dispatcher then testified, referring to her computer-aided dispatch (CAD) terminal print-outs, that she heard on the police radio at 6:16 P.M. that a vehicle had been stopped, without reference to the time of the shooting.  On cross-examination defense counsel further clarified the dispatcher's testimony, eliciting from her that she did not know when the shooting occurred.  Although the dispatcher's original testimony using "the shooting" as a point of reference should have been struck, as requested, we are satisfied that the matter was satisfactorily rectified and that there was no prejudice.  Moreover, redacted versions of the CAD print-outs were properly admitted showing the times of the incoming 911 calls and the time the officer communicated the stop of Gomes's vehicle over the police radio.

6.  Decision to charge defendant.  The prosecutor questioned a detective about the course of investigations generally, including participants in the decision to arrest and charge someone with a crime.  Defense counsel objected and moved

to strike the testimony.  The judge did not strike the testimony, but he told the prosecutor to "move on."  The prosecutor immediately proceeded to ask the detective to explain the role of the grand jury.  There was no objection, and the detective answered, "The grand jury hears all evidence and decides whether to indict or not indict the target of the investigation" (emphasis added).  The defendant argues that this testimony was both irrelevant and prejudicial as to the testimony to which there was an objection and that there was a substantial likelihood of a miscarriage of justice as to the testimony to which there was no objection.  As to the former, he contends that prejudice flowed from the witness's placement of the imprimatur of the police and prosecutorial hierarchy on his arrest and indictment.  With respect to the latter, he argues that a substantial likelihood of a miscarriage of justice flowed from the incorrect testimony that the grand jury heard all evidence, which it does not.

The defendant is correct in identifying this testimony as irrelevant.  It had no evidentiary value in this case, and the Commonwealth does not suggest otherwise.  If there is a need for the jury to be educated in such matters because of some relevance to the trial, special care must be taken to avoid putting the imprimatur of the State on the decision to arrest or to charge.  The evidence should have been struck.

That said, we discern no prejudice, where the witness was speaking generally, and not specifically to this case. Contrast Commonwealth v. Akara, 465 Mass. 245, 262 (2013) (improper argument by prosecutor who urged jury to find joint venture because police, district attorney's office, and grand jury found sufficient evidence to charge not one but two people). In addition, the judge's final instructions about the presumption of innocence and the absence of evidentiary value in an indictment adequately served to mitigate any potential for prejudice in this case.

7. Impeachment of defense witness. The defendant's girl friend testified that she left work at 5 P.M. on the day of the shooting. On her way home she stopped to get some take-out food for dinner. She arrived home at about 5:30 P.M. The defendant was home alone. They ate dinner together. After dinner, the defendant left. It was dark outside. She was impeached, without objection, with her failure to report exculpatory information to police. The defendant argues that the prosecutor failed to lay the necessary foundation.

Before a witness may be impeached for failure to report exculpatory evidence to police, the Commonwealth must establish "[1] that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available,

[and] [3] that he was familiar with the means of reporting it to the proper authorities." Commonwealth v. Hart, 455 Mass. 230, 238 (2009), quoting Commonwealth v. Brown, 11 Mass. App. Ct. 288, 296-297 (1981). The defendant claims that the Commonwealth failed to establish the first element.

The witness testified that as of the time of trial she had been dating the defendant for six years. They lived together on Dennis Street as of February 13, 2007. She learned that evening that he had been taken into custody. She continued to see him on a regular basis during the ensuing four years and eight months. Although the prosecutor did not specifically inquire whether she knew of the pending charges in sufficient detail to realize she possessed exculpatory information, it can reasonably be inferred from the circumstances of the events that evening and the fact of the ongoing relationship between the witness and the defendant that the witness knew she possessed exculpatory information. See Hart, 455 Mass. at 239. Moreover, she testified that the only reason she did not come forward was that she "didn't know [she] had to." There was no error.

8. Prosecutor's closing argument. The defendant cites five instances in the prosecutor's closing that he argues were improper argument. Prosecutors are bound to "limit the scope of their arguments to facts in evidence and inferences that may reasonably be drawn from the evidence." Commonwealth v. Coren,

437 Mass. 723, 730 (2002).  They may not "misstate the evidence or refer to facts not in evidence, [or] interject personal belief in a defendant's guilt" (footnote omitted).  Commonwealth v. Kozec, 399 Mass. 514, 516-517 (1987).

The defendant argues that the prosecutor went beyond the evidence when he asked the jury to use their "common sense" to consider "how quickly people call 911 when people have been shot."  He argues that this provided the basis for the prosecutor's argument that nine minutes passed between the time of the shooting and the time Gomes's vehicle was seen on Savin Street.  The woman who placed the first 911 call testified that she heard a loud bang and her children ran to the window to see what had happened.  They came running, asking her to help.  She went to the window to see what had happened and saw two men on the ground.  She promptly called 911 on her cellular telephone, which was already in her hand.  She estimated that approximately one minute had passed from the time she heard the bang to the point where she looked out the window.  The officer who stopped the Gomes's vehicle testified that the actual stop occurred at about 6:15 P.M.  Adding one minute to the period of time from the completion of the 911 call to the time Gomes's vehicle was stopped (not just seen) results in approximately ten minutes.  Although the "common sense" argument was contrary to the testimony of the 911 caller, this one-minute variance does not,

in our view, create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992). Moreover, it was in response to defense counsel's suggestion, without basis, that the time was fifteen to twenty minutes.

The defendant next contends that the prosecutor exceeded the scope of the evidence when he described the shooting incident on Langdon Street as motive for the shooting on Maywood Street. For the reasons stated above as to the propriety of the admission of evidence of prior bad act evidence on the question of motive, we conclude that the prosecutor's argument was properly grounded in the evidence.

The third instance cited by the defendant is the prosecutor's statement that the defendant told Clarimundo that "[t]hose are the people who shot A.J.," when Clarimundo's testimony before the grand jury was, "They said, that's the people who shot A.J." (emphasis added). We perceive no error in this aspect of the prosecutor's closing argument. The evidence indicates that the "they" to whom Clarimundo was referring was the defendant and an unidentified third person. It is a reasonable inference to draw from Clarimundo's description of the event that both persons were speaking and giving Clarimundo consistent information. Thus, the defendant inferably was a contributor of the information in question.

The defendant contends that the prosecutor suggested, without evidentiary support, that "part of the plan" of the defendant and Gomes was "not to leave any evidence behind" by firing from inside the vehicle and thus keeping the shell casings inside the vehicle.  This argument had evidentiary support.  There was evidence that "flashing lights" were seen coming from "the rear seat and the passenger seat" of the vehicle.  There also was evidence that spent shell casings are ejected through an ejection port of a semiautomatic gun and often pop out in the direction of the shooter.  No shell casings were recovered from the scene of the Maywood Street shooting.  The argument was fair comment.

The defendant's final assertion of prosecutorial misconduct in closing argument involves a claim of vouching where the prosecutor stated that the government had discretion to dismiss the charges and that "the suggestion that we are here to save face, frankly, is offensive."  The comment was in response to defense counsel's argument that "it's the Commonwealth that's been on a mission for the last couple of weeks to save face.  To save face from a bad decision.  What do I mean? . . .  Things are not always [as] they first appear to be."

This argument was improper vouching.  We have commented frequently on the problem of "fighting fire with fire."  See Kozec, 399 Mass. at 519.  Emotional responses to defense

counsel's closing argument seldom produce a professional result, let alone a good result; and this instance is no exception. Moreover, defense counsel's closing argument on this point was entirely appropriate. Nevertheless, defense counsel promptly objected, and the judge immediately told the jury to disregard the prosecutor's comment. The jury are presumed to have followed that instruction. See Commonwealth v. Barros, 425 Mass. 572, 580 (1997).

9. Bowden instruction. There is no merit to the claim that the judge declined to give the requested so-called Bowden instruction. See Bowden, 379 Mass. at 485-486. The defendant was permitted to argue that the police investigation was inadequate, a prevalent theme throughout this trial. There was no error in the decision to decline to give the requested instruction. See Commonwealth v. Lao, 460 Mass. 12, 22-23 (2011).

10. G. L. c. 278, § 33E. We have reviewed the entire record and the briefs, and we see no reason to exercise our power under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

Judgments affirmed.