NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11427

COMMONWEALTH  vs.  JOSEPH GOMES.


Suffolk.     April 8, 2016. - October 26, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.[1]


Homicide.  Armed Assault with Intent to Murder.  Assault and
     Battery by Means of a Dangerous Weapon.  Joint Enterprise.
     Intent.  Evidence, Joint venturer, Intent, Relevancy and
     materiality, Spontaneous utterance, Identification,
     Hearsay, Motive.  Jury and Jurors.  Identification.
     Practice, Criminal, Capital case, Jury and jurors, Question
     by jury, Instructions to jury, Request for jury
     instructions.


Indictments found and returned in the Superior Court
Department on May 2, 2007.

The cases were tried before Raymond J. Brassard, J.


David Keighley for the defendant.
Teresa K. Anderson, Assistant District Attorney (Julie
Sunkle Higgins, Assistant District Attorney, & Gretchen Lundgren
with her) for the Commonwealth.


---

[1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

BOTSFORD, J.  In December, 2010, a Superior Court jury convicted the defendant, Joseph Gomes, of murder in the first degree and of various related offenses involving the use of a dangerous weapon.  The charges arose from a drive-by shooting incident that took place in Boston on February 13, 2007, leaving Fausto Sanchez dead and several other young men wounded.

In this direct appeal from his convictions, the defendant argues that the judge erred by (1) denying his motion for a required finding of not guilty; (2) admitting in evidence certain items, including drugs, cash, and guns, that were seized from an apartment building owned by his parents; (3) permitting jurors to pose questions to witnesses, three of which were prejudicial; (4) admitting or excluding certain testimonial evidence; and (5) declining to instruct the jury on the theory of transferred intent.  The defendant also requests relief pursuant to G. L. c. 278, § 33E.  We affirm the defendant's convictions and decline to grant relief pursuant to § 33E.

1.  Background.  a.  Facts.  We summarize the trial evidence in the light most favorable to the Commonwealth.  See, e.g., Commonwealth v. Whitaker, 460 Mass. 409, 410 (2011).

In February, 2007, several members of the Gomes and DaSilva families lived in the same apartment building on Langdon Street in the Roxbury section of Boston.  The defendant's parents owned the building and lived in an apartment on the second floor; the

defendant's sister, brother-in-law, and nephew, Anthony DaSilva, lived in the first-floor apartment.  Anthony and the defendant's original codefendant, Emmanuel DaSilva, are cousins.[2]  Neither Emmanuel nor the defendant lived in the Langdon Street building.

On the morning of February 13, 2007, Anthony walked out of his home; as he approached his vehicle, he noticed a black Buick automobile (Buick) stopped at the intersection of George Street and Langdon Street.  As the Buick, a rented vehicle, proceeded slowly down George Street, its driver, David Evans, was looking at Anthony.  Shortly thereafter, while Anthony was sitting in his own vehicle, he saw the Buick again, this time driving fast and making a turn onto Langdon Street.  Anthony drove off quickly and circled the block; Evans followed him in the Buick. When Anthony returned to the area in front of the Langdon Street building, he parked and ran quickly inside the building with his father, who had been standing right outside the building's door, after which they both heard gunshots being fired.  A neighbor also heard the gunshots, looked out of her bedroom window, and saw a man chasing the Buick and firing several shots at it before running to the Langdon Street building.  Later the same day, Evans, who had rented the Buick, returned it to the rental agency with damage to a tire consistent with being struck by a

---

[2] We refer to members of the DaSilva family by their first names to avoid confusion.

bullet.[3]  Evans then rented a silver Nissan Maxima automobile with New Hampshire license plates.

Shortly after 9 A.M., Boston police officers responded to Langdon Street.  The defendant, who had arrived at the Langdon Street building within fifteen minutes of when police were dispatched there, was met by police who permitted him to enter the building to check on his parents.  At approximately 10 A.M., after the defendant had become upset and argumentative with the police, officers escorted him out of the building in handcuffs but, thereafter, released him and permitted him to leave.  The defendant drove away from Langdon Street in a rented silver Chevrolet Impala automobile with New Hampshire license plates. He returned in the same Impala to Langdon Street at some point later in the day.

Based on the report that an armed gunman had run into the Langdon Street building, police officers cleared the building of all its residents.  Four young men were removed from the common basement of the building, arrested, and charged with breaking and entering.[4]  Police officers secured the apartment building

_____

[3] The Buick automobile was later taken to a mechanic's shop for repair and something fell to the floor when the tire was removed.  A mechanic later located a bullet, near the wheel-changing machine, and it was turned over to the police.

[4] One of the four young men matched the neighbor's description of the man who had fired shots at the Maxima.  All

while they waited for a search warrant to be obtained, and no residents were permitted to return. While waiting, members of the Gomes and DaSilva families stayed in their own automobiles for what amounted to many hours, given that the police did not obtain the search warrant and conduct the search of the building until 10 P.M. that night. During the afternoon, the defendant's brother-in-law as well as one or more police officers observed Evans's Maxima drive by the building.

Evans lived on Maywood Street in Roxbury. At around 6 P.M. of the same day, Sanchez and several other young men -- Roberto Ramos-Santiago, Joel Perez, Ikim Lobban, Maurice Cundiff, Donnell Grady, and Rodney Hoyte -- were standing together on the porch and sidewalk near a house on Maywood Street, across the street from Evans's house. Evans's rented Maxima was parked along the sidewalk near the group.

At that time, the defendant drove the Impala quickly down Maywood Street and stopped abruptly when the vehicle reached the group. Shots were fired from the open front and back windows on the passenger side of the Impala at the men in the group. When the shooting ceased, the defendant sped off in the Impala toward Blue Hill Avenue. Within minutes, Boston police officers responded to the scene and discovered Sanchez and several

four men were held in police custody overnight before being released the following morning.

additional shooting victims.  Sanchez was shot one time in the lower back.  He was transported to a hospital where he arrived in cardiac arrest and was pronounced dead shortly thereafter.  The cause of death was blood loss due to the gunshot wound.  During the autopsy, fragments of a copper jacket and lead core were recovered from his abdomen.  Ramos-Santiago sustained multiple gunshot wounds to his back and arm.  He also was transported to a hospital where a bullet was removed from his arm.  Perez was shot in his right calf, and Cundiff fractured his arm when he jumped over a fence to escape the gunfire.  At the scene, Perez told a police officer that the shooters were in a gray, four-door, newer model Chevrolet Impala, and this description was broadcast over the police radio.[5]

Police officers recovered one spent .380 caliber shell casing along the curb of the sidewalk in front of the Maywood Street house and one spent .38 caliber bullet from the kitchen floor of a home on Savin Street; that bullet had entered through a rear window that faced Maywood Street.  In the meantime, shortly after 6 P.M., a detective who was driving to the Maywood Street scene observed a Chevrolet Impala that matched the description of the vehicle given by witnesses.  The defendant was the driver, and Emmanuel the front seat passenger.  The

---

[5] All of the men who were wounded in the attack testified at trial.

detective stopped the defendant's vehicle. Additional police officers arrived within seconds. Emmanuel and the defendant were taken into police custody, and the Impala was towed from the scene. Officers thereafter searched the Impala pursuant to a warrant and discovered six spent .380 caliber shell casings on the front passenger side, two on the seat and four on the floor. There also was a piece missing from the vehicle's passenger side mirror.

Two guns, a .38 revolver and a .380 semiautomatic pistol, were used in the Maywood Street shooting.[6] The .38 caliber bullet recovered from the kitchen floor on Savin Street and the .38 caliber bullet recovered from Ramos-Santiago's arm were fired from the same gun. In addition, the spent .380 caliber shell casing found on Maywood Street and the six .380 caliber shell casings found inside the Impala were fired from the same gun. The bullet fragments removed from Sanchez's body were inconsistent with a .380 caliber bullet, and Detective Tyrone Camper, the Commonwealth's ballistics witness, was unable to determine whether the fragments were consistent with a .38 caliber bullet. Neither a .38 revolver nor a .380 semiautomatic pistol was recovered in connection with this case.

---

[6] According to a Boston police ballistics expert, .380 caliber ammunition and .38 caliber ammunition are not interchangeable; a .380 caliber cartridge is designed to be used in a semiautomatic pistol, while a .38 caliber cartridge is designed to be used in a revolver.

At around 10 P.M., Boston police officers executed a search warrant at the Langdon Street building. In the first-floor apartment, officers found mail dated May, 2006, and addressed to the defendant there; two bags of marijuana; two electronic scales; and $7,447 in cash found hidden in the headboard of a bed. In the basement, police officers found personal papers, some of which belonged to the defendant; "crack" cocaine; marijuana; $545 in cash; a red hooded sweatshirt; a .25 caliber firearm and a .22 caliber firearm, each loaded with six rounds of ammunition; a nine millimeter firearm loaded with eight rounds of ammunition; and a .380 caliber Mauser semiautomatic firearm containing no ammunition.[7,8]

b. Procedural history. On May 2, 2007, a grand jury returned indictments charging the defendant with murder in the first degree, six counts of armed assault with intent to murder; assault and battery by means of a dangerous weapon, aggravated assault and battery by means of a dangerous weapon, four counts of assault by means a dangerous weapon, possession of a firearm

---

[7] Two discernible latent fingerprints were found on the firearms; neither was a match for the defendant. He was not charged with any offenses in connection with the drugs and firearms found in the building.

[8] The bullet found at the mechanic shop in connection with the Buick automobile rented by Evans and five .380 caliber shell casings found by police outside the Langdon Street building were fired from the Mauser found in the basement of the Langdon Street building.

without a license, and possession of ammunition without a firearm identification card.[9] Trial before a jury began in November, 2010.[10] The Commonwealth's theory at trial was that the defendant was guilty of the charged offenses as a joint venturer with Emmanuel to carry out the Maywood Street shooting in an attempt to retaliate against Evans for pursuing and frightening Anthony and causing the extended police occupation of the family's apartments. The defense theory was a combination of mistaken identity where the vehicle driven by the defendant did not match the eyewitness descriptions of the assailants' vehicle, and that the defendant did not knowingly participate with Emmanuel in a joint venture with the specific intent to kill Sanchez or to commit the other crimes.

On December 13, 2010, the jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation, four counts of armed assault with intent to murder, assault and battery by means of a dangerous weapon, aggravated assault and battery by means of a dangerous weapon,

---

[9] Prior to trial, the Commonwealth filed nolle prosequis in relation to the indictments for unlawful possession of a firearm and ammunition.

[10] The defendant was to be tried together with Emmanuel DaSilva and the trial began against both, but due to illness of Emmanuel's counsel during trial, a mistrial was declared with respect to Emmanuel, and the trial proceeded against the defendant only. Emmanuel was subsequently tried and found guilty of all charges. This court affirmed his convictions. Commonwealth v. DaSilva, 471 Mass. 71 (2015).

and two counts of assault by means of a dangerous weapon.[11]  He received a mandatory life sentence without the possibility of parole on the murder conviction, and a sentence of from seventeen to eighteen years on the conviction of armed assault with intent to murder Ramos-Santiago, to be served from and after the life sentence.[12]

2.  Discussion.  a.  Sufficiency of the evidence.  The defendant challenges the sufficiency of the evidence supporting his conviction of murder in the first degree as well as the additional crimes, arguing that no rational jury could find beyond a reasonable doubt that he knowingly participated in the shooting incident on Maywood Street and did so with the requisite specific intent to kill Sanchez.[13]  See Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009).[14]

---

[11] The defendant was found not guilty of two counts of armed assault with intent to murder and two counts of assault by means of a dangerous weapon.

[12] On the remaining convictions the defendant was sentenced to shorter sentences, to run concurrently with the from and after sentence.

[13] At the close of the Commonwealth's case and again at the close of all the evidence, the defendant's motions for a required finding of not guilty on all crimes charged were denied.

[14] The defendant also argues that no rational fact finder could find beyond a reasonable doubt that he knowingly participated in the killing of Sanchez with the motive alleged by the Commonwealth.  The Commonwealth, however, does not bear the burden of proving motive as an element of the crime charged.

We review the denial of a motion for a required finding of not guilty to determine whether the evidence, viewed in the light most favorable to the Commonwealth, "was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime[s] charged." Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007), and 460 Mass. 12 (2011), quoting Commonwealth v. Campbell, 378 Mass. 680, 686 (1979).  From the evidence, a reasonable jury could find that the defendant, whose family lived in the Langdon Street building, was motivated by anger at the events that resulted from Evan's actions toward his nephew, Anthony, i.e., family members having to vacate the house for more than twelve hours, and police securing and apparently intending to search the entire building; that the defendant was the driver of the Impala that sped down Maywood Street -- the street where Evans lived -- and stopped the vehicle directly parallel to the group of young men standing near where Evans's Maxima was parked; that the defendant remained stopped at that location while multiple shots were fired from two different weapons at the group of young men; that when the shooting ceased, the defendant sped off, quickly removing the shooters from the scene; and that the shell casings located in the

---

See Commonwealth v. Carlson, 448 Mass. 501, 508-509 (2007), citing Commonwealth v. Campbell, 378 Mass. 680, 688 n.8 (1979).

defendant's vehicle were consistent with at least one casing found at the scene.

This evidence was more than sufficient to permit a reasonable fact finder to infer that the defendant knowingly participated in the shooting incident and had or shared an intent to kill one or more of the young men standing in the group near Evans's rented Maxima,[15] even assuming for argument that the evidence would not permit a finding that the defendant himself shot one of the guns involved.  See, e.g., Commonwealth v. Williams, 422 Mass. 111, 121 (1996) ("Joint venture may be proved by circumstantial evidence, including evidence of flight together"); Commonwealth v. Giang, 402 Mass. 604, 608-609 (1988) (knowing participation may be inferred where defendant drives getaway vehicle).  See also Commonwealth v. Cintron, 435 Mass. 509, 515-516 (2001), overruled in part on other grounds, Commonwealth v. Hart, 455 Mass. 230, 239-242 (2009) (defendant's knowing participation with brother in victim's murder and shared intent to kill established where defendant knew of prior violent history between brother and victim, chased victim alongside brother, and encouraged brother to shoot victim); Commonwealth

---

[15] As discussed infra, this is not a case where the Commonwealth proceeded on a theory of transferred intent. Rather, the Commonwealth's theory was that the defendant and Emmanuel actually intended to kill one or more of the members of the group standing in the street in the mistaken factual belief that Sanchez or another of the young men was Evans or associated with Evans.

v. Soares, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979)
(intent may be inferred from "defendant's knowledge of the
circumstances and subsequent participation in the offense").[16]

b. Admission of evidence seized from Langdon Street
building. At trial, over the defendant's objection, the judge
allowed in evidence the items seized by the police from the
Langdon Street building during their search of the premises.
The defendant renews his challenge to the admission of this
evidence, arguing that it was irrelevant for any of the purposes
stated by the judge, and, alternatively, that even if marginally

---

[16] The defendant advances a related argument that, for the
crimes at issue that include possession of a weapon as an
element of the offense, there was insufficient evidence for a
reasonable jury to conclude beyond a reasonable doubt that the
defendant knew his passenger (or passengers) in the Impala were
armed. See Commonwealth v. Britt, 465 Mass. 87, 100 (2013)
(where conviction is based on joint venture theory of crime that
has as element use or possession of weapon, Commonwealth bears
"the burden of proving that [the defendant] had knowledge that a
member of the joint venture had a weapon"). This claim fails:
the evidence certainly permits an inference that the defendant
knew his companion or companions possessed dangerous weapons.

The defendant also argues for the first time on appeal that
the judge failed to instruct the jury on the knowledge
requirement described in Britt, supra at 100, which warrants
reversal of the convictions of the crimes to which the knowledge
requirement applied, and the grant of a new trial. We disagree.
The defendant did not object to the omissions of the instruction
at trial, and the absence of the instruction, although error,
did not create a substantial likelihood of a miscarriage of
justice because the circumstantial evidence of the defendant's
knowledge that Emmanuel (or any other passenger in the Impala
with the defendant on Maywood Street) was armed was "strong and
one-sided" (citation omitted). Commonwealth v. Amirault, 424
Mass. 618, 650 (1997). See Commonwealth v. Randolph, 438 Mass.
290, 297-298 (2002).

relevant, the probative value of this evidence was substantially outweighed by the risk of prejudice.

"[E]vidence of uncharged criminal acts or other misbehavior is not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as 'common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive.'" Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006), quoting Commonwealth v. Marshall, 434 Mass. 358, 366 (2001). See Mass. G. Evid. § 404(b) (2016). The trial judge admitted the evidence challenged by the defendant for the limited purpose of proving the defendant's knowledge, motive, or intent. The evidence was relevant with respect to all three of these issues, where the Commonwealth's theory was that the defendant (and Emmanuel), based on loyalty to family and friends, sought to retaliate against Evans for Evans's pursuit of Anthony and the family members' subsequent disruption and loss of valuable items (the cash, guns, and drugs in the basement) due to police action in response to the incident involving Anthony and the police seizure of the contraband items. This evidence provided a possible explanation for the defendant's clear agitation about the presence of the police in his family's apartment building and more directly showed the extent of the loss to the defendant's family members and friends, which may have fueled

the defendant's desire to retaliate over and above Evans's threatening conduct toward Anthony. See Commonwealth v. DaSilva, 471 Mass. 71, 79 (2015) (evidence of uncharged conduct relevant to show motive to retaliate). See generally Commonwealth v. Arroyo, 442 Mass. 135, 144 (2004) (evidence is relevant if it has "rational tendency to prove an issue in the case, . . . or [would] render a desired inference more probable than it would be [otherwise]" [quotation and citations omitted]); Mass. G. Evid. §§ 401-402 (2016).

The defendant's argument -- that the evidence is, at best, attenuated because little connection was shown between the defendant and the specific contraband items found in the building -- is not without some merit, but the link between the over-all inconvenience to the defendant's family and his alleged motivation to commit the crime was certainly strong enough to satisfy the threshold requirement of relevance. See Commonwealth v. Ashley, 427 Mass. 620, 624-625 (1998), quoting Commonwealth v. St. Germain, 381 Mass. 256, 271 (1980) ("There is no requirement that evidence [of motive] be conclusive in order to be admissible"). See also Arroyo, 442 Mass. at 144, quoting Commonwealth v. Sicari, 434 Mass. 732, 750 (2001), cert. denied, 534 U.S. 1142 (2002) (evidence need only provide "a link in the chain of proof").

Balancing the probative value of this evidence against its prejudicial effect presents a closer question. See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014) ("Even if the evidence is relevant to one of [the permissible] purposes, the evidence will not be admitted if its probative value is [substantially] outweighed by the risk of unfair prejudice to the defendant"); Mass. G. Evid. § 403 (2016). Considerations that diminish probative value in this particular case include the following: the defendant himself did not live on Langdon Street, and was not present when the incident involving Evans and Anthony took place; the defendant was not charged with any crimes related to the items seized from the two apartments in the building at the Langdon Street address, nor was there any evidence otherwise that he was connected to any activities relating to the sale of drugs or weapons; and the defendant could not have known the specific identity and value of the items ultimately seized from the Langdon Street apartment building when the shooting incident on Maywood Street took place because the police did not execute the search warrant until approximately four hours later. On the other side of the ledger -- prejudicial effect -- the introduction of evidence of drugs, cash, and multiple guns, along with some personal papers addressed to the defendant, in a trial for murder and other violent crimes that have as an element the use of a dangerous weapon, presents a real potential

to paint the defendant generally as a violent man connected to a violent family and involved in a life of crime; it presents a threat of being used improperly by the jury as evidence of bad character and criminal propensity.

The question whether the evidence was more prejudicial than probative is close, but we recognize that the trial judge is in the best position, and consequently possesses substantial discretion, to resolve the question. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (abuse of discretion occurs only where "the judge made 'a clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" [citation omitted]). Particularly in light of the judge's instruction, given during trial when the evidence was admitted and repeated in his final jury charge, that the evidence was offered for a limited purpose and the jury were not to consider the evidence for the purpose of "criminal personality" or "bad character," we conclude that there was no error.[17]

---

[17] Moreover, even assuming that the evidence should not have been admitted, the admission would likely not qualify as prejudicial error warranting reversal, given the strength of the evidence that the defendant knowingly participated in the Maywood Street shooting incident with the requisite intent to kill. See Commonwealth v. Cruz, 445 Mass. 589, 591 (2005), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994) (error is nonprejudicial if it "did not influence the jury, or had but very slight effect").

c. Questions posed by the jury. Over the defendant's objection, the trial judge permitted jurors to ask questions of the witnesses. During his preliminary charge to the jury, before any witnesses testified, the judge instructed the jurors that once the parties finished examining each witness, the jurors would be permitted to ask questions in accord with certain procedures that he then explained -- procedures that conformed to those spelled out in Commonwealth v. Urena, 417 Mass. 692, 701-703 (1994), and Commonwealth v. Britto, 433 Mass. 596, 613-614 (2001). On appeal, the defendant challenges the responses to three separate questions posed by jurors, to each of which he objected at trial. There was no error.

First, the defendant challenges a detective's response to a question about the distance or space between the driver's seat and the front passenger's seat of the Impala: the detective responded that he did not believe that there was enough distance between these two seats for a person to move from the back seat to the front, but he did not know. The defendant argues that the detective's response (1) lacked foundation and was speculative, (2) lessened the Commonwealth's burden of proof and prejudiced the defense because it corroborated evidence that two guns were involved and eyewitness testimony that gunfire was observed coming from the front and rear passenger seats; and (3) improperly raised an inference that another shooter, who had

been in the back seat, had left the Impala before it was stopped by the police, which would explain why witnesses observed shots coming from the back seat despite the absence of a back seat passenger when the police stopped the Impala.  We disagree that the question or its response were improper or created unfair prejudice.  The detective based his response on personal knowledge, having viewed the interior of the Impala, and in any event, the response was qualified by his final statement that he did not know.[18]  See Cintron, 435 Mass. at 521 ("The only foundation required for the testimony of lay witnesses is the ability to perceive, recall, and recount information within the witness's personal knowledge").  The fact that the detective's response may have corroborated eyewitness testimony regarding the shooting event, or supported an inference that there was another shooter who escaped detection -- an inference that the eyewitness testimony independently made plausible -- was not a proper ground for excluding the question or striking the response.

Second, the defendant argues that a question put to a criminalist concerning damage to the Impala's exterior mirror, and the criminalist's response -- that he could not tell whether

_____

[18] The jurors also heard evidence from a detective that the center console of the Impala was six inches wide, from which they could draw their own conclusions regarding a person's ability to move from the back to the front of the vehicle.

the damage to the mirror was caused by a bullet originating either inside or outside the vehicle -- were unfairly prejudicial because the question "had a speculative premise and a tenor of investigation and advocacy, suggesting a cause for the damage that advanced the Commonwealth's case." We cannot say that the question was improper, see Britto, 433 Mass. at 613 ("manner of questioning rests in sound discretion of the trial judge"), and, in any event, the response was of little, if any, evidentiary value in favor of the Commonwealth; it could not have caused meaningful prejudice to the defendant.

Third, the defendant contends that the ballistic expert's testimony -- that shell casings fired from a gun inside a vehicle could end up both inside the vehicle and on the street outside, four to six feet away from the vehicle -- was admitted erroneously because the expert had not been at the scene of the crime, which rendered his testimony speculative. The expert's response was not speculative; he answered based on his education, training, and experience as to the manner in which a cartridge is ejected from a weapon, rather than drawing on the circumstances of this particular case. See Cintron, 435 Mass. at 521.

The defendant also argues that the expert's response impermissibly provided a basis for the jury to find that the shell casing found on Maywood Street and the six shell casings

found inside the Impala were fired at the same time from the same weapon. That the shell casings were fired at the same time (or within a very short time span) was a fair inference to draw from the unobjected-to evidence that all the shell casings were fired from the same gun, and that the shooting occurred just minutes before the defendant's vehicle was stopped in close proximity to Maywood Street.

The defendant further contends that the "larger problem" presented by the juror questioning in this case is in essence that the judge permitted unnecessary and extensive questioning, which promoted premature deliberations and allowed jurors to act as advocates. We disagree. "[T]he decision to allow juror questioning and the manner of questioning rests in the sound discretion of the trial judge. It need not be limited to any particular type of case [and t]he judge may permit questioning over objection of all parties." Britto, 433 Mass. at 613. Here, the judge carefully reviewed each juror question with counsel before posing it to the witness; in some instances, the judge either refined the question or declined to ask the question at all. The defendant does not point to any specific event or aspect of the trial, and we have not found any, suggesting that premature deliberations took place. Moreover, the judge specifically instructed the jurors that they were not advocates. The judge carefully adhered to the procedural

guidelines set forth in Urena, 417 Mass. at 701-703, as modified by Britto, 433 Mass. at 613-614, for the proper manner in which to permit juror questions, and the judge instructed the jury in accord with those guidelines.  The defendant has not met his burden of showing actual prejudice.  See Britto, supra at 611 ("defendant has the burden of showing actual prejudice from juror questions").  See also Urena, supra at 699.

d.  Additional evidentiary issues.  The defendant challenges the admission or exclusion of certain testimonial evidence offered by various witnesses.  For each challenge, we review for prejudicial error because the defendant objected at trial.

i.  Perez's description of the shooters' vehicle.  A police officer testified that he arrived at the crime scene on Maywood Street within three minutes of the dispatch, and Perez, who had been shot and was shouting and agitated, told him that the shooters' automobile was a gray, four-door, newer model Chevrolet Impala.  The testimony was admitted as a spontaneous utterance.  The defendant argues that Perez's statement did not meet the requirements of this exception to the hearsay rule because "despite being upset and suffering from a gunshot wound . . . , [Perez] did not speak under the influence of an exciting event without reflection."

A statement qualifies as a spontaneous utterance and, therefore, an exception to the traditional prohibition on hearsay, if:  "(A) there is an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer, and (B) the declarant's statement was a spontaneous reaction to the occurrence or event and not the result of reflective thought."  Mass. G. Evid. § 803(2) (2016). See Commonwealth v. Santiago, 437 Mass. 620, 623-624 (2002), and authorities cited.  The circumstances of being the target of a drive-by shooting and actually being shot were certainly enough to permit a reasonable finding that Perez was sufficiently startled to render inoperative his normal reflective thought processes.  See Commonwealth v. Irene, 462 Mass. 600, 607 (2012).  The testimony fell squarely within the spontaneous utterance exception and its admission did not constitute error.

ii.  Identification of Evans and where he resided.  The defendant argues that the judge erred by admitting in evidence a photograph of Evans through a neighbor, a witness for the Commonwealth, because the Commonwealth offered no direct or circumstantial proof that the photograph shown to the neighbor genuinely depicted Evans and, therefore, the photograph lacked a proper foundation for admission.  The neighbor testified that she recognized the person depicted in the photograph shown to her by the prosecutor;  she stated that she did not know the

person's name, but she knew that the person in the photograph lived on the second floor in her apartment building[19] and was the son of her landlord's fiancée, Michelle Evans.  This testimony provided a sufficient basis for the photograph's admission.

The defendant also argues that testimony to the effect that the police learned that Evans lived on Maywood Street was based on information conveyed to the police by others and offered at trial for the truth of the matter asserted, which constituted inadmissible hearsay.  Evidence that Evans lived at this address was provided by a police detective.  Over the defendant's objection, the exchange between the prosecutor and the detective was as follows:

Q.:  "Did you learn about a specific person who was residing [on] Maywood Street?"

A.:  "Yes."

Q.:  "And what was the name of this person?"

A.:  "David Evans."

Q.:  "Do you see the photograph that I'm showing you on the monitor right now . . . ?"

A.:  "I do."

Q.:  "And based on your involvement with this investigation, who do you know that person [in the photograph to be]?"

A.:  "David Evans."

---

[19] Evans's driver's license listed his address as being on West Springfield Street.

The officer testified based on knowledge gained through his personal participation in the investigation of the incident. We cannot say that the judge abused his discretion in allowing the testimony. See Cintron, 435 Mass. at 521; L.L., 470 Mass. at 185 n.27.

iii. Testimony regarding damage to the Impala's side mirror. The police criminalist testified that a piece of the passenger side mirror measuring three and one-half inches by two inches was missing. He performed a gun powder residue analysis of the mirror, which was inconclusive with respect to whether a bullet had caused the damage to the mirror. He initially testified that he formed no conclusion about how the damage was caused, but later stated in response to questions from the prosecutor that the damage could have been caused by a bullet being fired from inside or from outside the vehicle. The defendant argues that where the criminalist had no personal or specialized knowledge as to how the damage occurred, he should not have been permitted to testify that the damage could have been caused by a bullet. The Commonwealth responds that, on balance, the testimony caused no prejudice because the criminalist made it clear that the damage could also have been caused by something other than a bullet.

Even assuming that it was error to allow this testimony, the defendant's claim fails because the jury were not likely to

be affected by the evidence. See Commonwealth v. Flebotte, 417
Mass. 348, 353 (1994). The jury heard testimony from the
criminalist that the result of the gun residue analysis was
inconclusive and that the damage may well have been caused by
something other than a bullet. More importantly, evidence as to
the manner in which the damage was caused to this mirror had
little, if any, bearing on whether the defendant knowingly
participated in the shooting event on Maywood Street with the
requisite intent.

   iv. Denial of request to offer testimony of police
officer. The defendant argues that the judge improperly
excluded the proffered testimony of a police officer, thus
depriving him of his constitutional right to present a defense.
At trial, the defendant sought to introduce testimony from the
officer to the effect that when the officer arrived at the scene
on Maywood Street, at least two people stated that the shooters
drove away in a white car. The purpose of this testimony was to
contradict testimony given by other witnesses that the shooters
drove away in a gray or silver vehicle -- the color of the
vehicle in which the defendant and Emmanuel were found shortly
after the shooting had occurred. The judge conducted a voir
dire of the officer, during which the judge learned that the two
purported eyewitnesses on which the proffered testimony relied
did not in fact see the vehicle from which the shots were

fired.[20]  The judge did not permit the officer to testify to the two witnesses' purported observations on the basis that the proffered testimony would have been cumulative of evidence previously admitted that the vehicle had been described by one or more observers as white.  The judge acted well within his discretion in excluding the proffered testimony.  See Commonwealth v. Brown, 449 Mass. 747, 770 (2007), quoting Commonwealth v. Carroll, 439 Mass. 547, 553 (2003).

e.  Instruction on transferred intent.  The defendant argues that the judge erred in denying his request for a jury instruction on transferred intent because its omission raised the risk that the jury would return a guilty verdict on the charge of murder in the first degree, despite the absence of proof beyond a reasonable doubt that the defendant had or shared a specific intent to kill Evans.  He claims that the only remedy for such an error is a new trial.

At the charge conference, the Commonwealth requested that the judge instruct the jury that, on the charge of murder in the first degree, the defendant intended to kill "an individual," rather than requiring the jury to find that he intended to kill Sanchez in particular; the defendant and the judge agreed that

---

[20] The witnesses who gave the statements to this police officer later told other police officers that they did not see the vehicle from which the shots were fired, and they testified to the same effect before the grand jury.

this was fair.  The defendant requested, however, that the judge instruct the jury that the Commonwealth was required to prove that the defendant intended to kill Evans, specifically, based on the motive theory argued by the Commonwealth throughout the trial.  He also requested that this instruction be followed by a transferred intent instruction.  To require anything less, he argued, would be to dilute the Commonwealth's burden of proof. The judge denied the defendant's two-part request, ruling that giving such an instruction "would be tantamount to" requiring the Commonwealth to prove beyond a reasonable doubt the motive for a crime, which is not an element of a criminal offense.

The judge's denial of the defendant's request for a transferred intent instruction was proper.  A transferred intent instruction is appropriate where a defendant "intends to kill a person and in attempting to do so mistakenly kills another person, such as a bystander."  Model Jury Instructions on Homicide, at 39 (2013).  See, e.g., Commonwealth v. Shea, 460 Mass. 163, 165-167, 173-174 (2011) (transferred intent instruction appropriate where fourteen year old girl killed instead of intended target who pulled girl in front of him during gunfire); Commonwealth v. Puleio, 394 Mass. 101, 102, 109 (1985) (transferred intent instruction appropriate where defendant fired bullet at intended target, who ducked, and bullet struck and killed bystander).  To prove the charge of

murder in the first degree in this case, the Commonwealth was required to prove beyond a reasonable doubt that the defendant, either himself or as an aider and abettor, intentionally fired shots into the group of young men on Maywood Street with the specific intent to kill one or more of them.  The Commonwealth was not required to prove that, in firing the shots, the defendant and Emmanuel intended to shoot Evans specifically, or any other person specifically identified.  That is, even though it was the Commonwealth's theory that the motive for the shooting incident was to punish or retaliate against Evans, there was no requirement that the Commonwealth prove that Evans was the specific target of the shots fired.  A transferred intent instruction was not required.  See Commonwealth v. Noxon, 319 Mass. 495, 547-548 (1946), quoting First National Bank v. Mathey, 308 Mass. 108, 115 (1941) (no error in declining to give transferred intent instruction where evidence did not create need for instruction).

f.  Review under G. L. c. 278, § 33E.  We have reviewed the entire record and discern no reason to exercise our power under G. L. c. 278, § 33E, to grant a new trial or reduce the degree of guilt on the conviction of murder in the first degree.

Judgments affirmed.