NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10610

COMMONWEALTH  vs.  ODAIR FERNANDES.


Suffolk.     October 6, 2017. - February 2, 2018.

Present:  Gants, C.J., Budd, Cypher, & Kafker, JJ.


Homicide.  Joint Enterprise.  Constitutional Law, Fair trial.
    Due Process of Law, Fair trial.  Fair Trial.  Evidence,
    Joint venturer.  Practice, Criminal, Fair trial, Argument
    by prosecutor, Instructions to jury, Capital case.



    Indictments found and returned in the Superior Court
Department on September 24, 2003.

    The cases were tried before Margaret R. Hinkle, J.; and a
motion for postconviction relief, filed on October 1, 2014, was
considered by Garry V. Inge, J.


    Deirdre L. Thurber for the defendant.
    Cailin M. Campbell, Assistant District Attorney (Patrick M.
Haggan, Assistant District Attorney, also present) for the
Commonwealth.


    KAFKER, J.  A Superior Court jury convicted the defendant,

Odair Fernandes, of murder in the first degree on the theory of

deliberate premeditation, for the killing of Jose DaVeiga, and

armed assault with intent to murder, for the shooting of

Christopher Carvalho.[1]  The defendant's direct appeal was consolidated with his appeal from the denial of his motion for a new trial.  The defendant raises four issues.  First, he argues that his right to a public trial under the Sixth Amendment to the United States Constitution was violated by the trial judge's order limiting court room entry only to attendees whose names were submitted and approved.  Second, he claims that the evidence presented at trial was insufficient to support a finding of joint venture.  Third, he contends that the prosecutor in his closing argument used rhetorical questions to improperly shift the burden of proof and to address witness credibility.  Fourth, he argues that the trial judge erred in her instruction to the jury about how to evaluate the credibility of cooperating witnesses.

We conclude that there has been no reversible error, and after a thorough review of the record, we decline to exercise our authority under G. L. c. 278, § 33E, to reduce or set aside the verdict of murder in the first degree.  Therefore, we affirm the defendant's convictions.  We also affirm the denial of the defendant's motion for postconviction relief.

---

[1] The jury also convicted the defendant of carrying a firearm without a license, and possessing ammunition without a firearm identification card.

Background.  We summarize the facts that the jury could have found, reserving certain details for discussion of the legal issues.

On April 17, 2003, the defendant was driving his Volkswagen automobile with passengers Danny Fernandes and Jose Alves when he cut off a vehicle driven by Joao Nunes on Bowdoin Street in the Dorchester section of Boston.  Nunes's passenger, Alfredo Goncalves, got out of the automobile and threatened the defendant, repeatedly stating that he was going to hurt him. The defendant drove away.

After acquiring a handgun, Nunes and Goncalves drove back later that day to the Bowdoin Street neighborhood looking for people with whom they had "dramas."  This included the Cape Verdean Outlaws gang, of which the defendant and his friends were members.  As Nunes drove past the defendant's house, Goncalves pointed out Amilton Dosouto, an individual with whom he had issues.  Dosouto was standing in the defendant's driveway next to the defendant's Volkswagen Golf automobile, while Alves sat on the porch.  As Nunes drove by, Goncalves fired from the passenger side of the automobile, hitting Dosouto in the chest and Alves in the stomach and the leg.  The defendant ran into the street, firing at Goncalves.  His shots hit Nunes, who then crashed his vehicle.

When police arrived at the scene, the defendant was near Dosouto. Boston police officer testified that he heard the defendant state repeatedly, "Somebody is going to die for this," and that when asked for information about the shooting, the defendant told him, "I got nothing to say to you. Somebody's going to die for this." Alves testified that while he was recovering in the hospital, he spoke to the defendant on the telephone and the defendant said, "Don't worry about it," because the people responsible were "going to get it." Dosouto considered the defendant to be like a younger brother.

On April 24, 2003, the defendant rented a white minivan. There was no indication on the record that his Volkswagen Golf automobile was inoperable.

On April 28, 2003, three of Goncalves's friends, Jonathan DaSilva, Jose DaVeiga, and Christopher Carvalho, left a night club in Boston after 2 A.M. DaSilva was driving his Ford Taurus automobile and stopped at a red traffic light on East Berkley Street when shots were fired at his automobile. His passengers, DaVeiga and Carvalho, were both hit multiple times. DaVeiga died as a result. Carvalho survived but was paralyzed from the neck down and blinded in his left eye.

An eyewitness to the shooting testified that two or three people fired shots at the Ford automobile from the passenger side door of a white van. The eyewitness testified that all of

the van's occupants wore sports jerseys, and that one wore New England Patriots colors while another wore a green and white jersey.

Shortly after the eyewitness notified the police of the shooting, officers stopped a white minivan in Dorchester. The defendant, wearing a Boston Celtics jersey, was in the front passenger seat. Danny Fernandes, wearing a Dallas Cowboys jersey, was in the driver's seat. Carlos Silva, wearing a red, white, and blue Atlanta Braves jacket, was in the rear passenger seat. The eyewitness was brought to the scene, where he identified Danny Fernandes and Silva as the driver and shooter but did not identify the defendant.

A police search of the minivan recovered two .25 caliber shell casings and a nine millimeter firearm hidden underneath a cup holder in the back of the van. The firearm was wrapped in a piece of paper torn from a Volkswagen Golf automobile manual. A Volkswagen Golf automobile manual was also found in the van, along with a crowbar. The firearm did not match the bullets recovered from the victims' bodies, but did match other spent shell casings recovered at the scene of the shooting. The police also found a white minivan rental agreement in the defendant's name, dated April 24, 2003.

Discussion. 1. Sixth Amendment right to public trial. This case was permeated with concerns about security from the

outset, as evidenced through six pretrial hearings and conferences and discussions at trial.

At a February 3, 2005, hearing on a protective order, the trial judge stated that she was "terribly concerned" about safety issues in this case.[2] Several of the codefendants and their family members had been shot at between the time of the original shooting and the defendant's indictment, and cooperating codefendants and witnesses had expressed concerns regarding distribution of the paper records of their grand jury testimony.[3] As a result, protective orders were put in place to restrict access to discovery materials, and the grand jury minutes were impounded.

At a May 11, 2006, pretrial conference, the judge again raised concerns about security during trial, explaining that she would "take every precaution," partly because the court was short on court officers. She also first raised the possibility

---

[2] The involvement by the Cape Verdean Outlaws in ongoing violence that generated specific concerns about retaliation and witness intimidation, including threats to Jose Alves, was discussed at the hearing on the protective order.

[3] The defendant was set to be tried jointly with two codefendants, Henrique Lopes and Jose Lopes, until the first day of the defendant's trial, when the charges against the codefendants were nol prossed because of a missing witness. The Commonwealth's theory of the case was that the defendant and seven other individuals (including Henrique Lopes and Jose Lopes) perpetrated the crime in two separate automobiles. The Commonwealth had alleged that Henrique Lopes and Jose Lopes were two of the gunmen.

of creating a list of people permitted to enter the court room, and asked counsel to discuss this option.

On May 25, 2006, the judge reiterated her concerns that the gang elements of this case could exacerbate preexisting security problems at the court house. The judge again suggested an approved attendees list and requested that counsel prepare lists of family members and close friends that the parties might want in attendance. When counsel for then-codefendant Henrique Lopes objected, the judge enumerated the concerns behind her request for an approved attendees list. She stated that there were ongoing security issues at the court house, there was a lack of sufficient court officers, and the case presented "at least overtones of Cape Verdean gangs." The judge noted that prior cases with similar gang overtones had raised security issues, and her concern was to protect the security of everyone in the court room, including the defendant and court staff. She emphasized that media would be permitted to attend the trial and reiterated that the court house was not a secure facility. Counsel for the defendant and both codefendants all objected to the proposed attendees list, and the judge noted these objections for the record. She also asked counsel to propose other reasonable ways to address the underlying security concerns.

On May 30, 2006, the judge clarified that the parties could add people to the approved attendees list during trial with twenty-four hours' advance notice. The advance notice was necessary to conduct sufficient background checks on the individuals to ensure that they would not pose a safety risk in the court room. The judge further explained her concern about insufficient court officer staffing: six court officers would be present in the court room during trial, but this would leave no one to ensure security in the hallway outside.[4]

On June 8, 2006, the parties were again before the judge discussing trial security. After the defendant and codefendants submitted their initial lists of desired attendees, the Commonwealth objected to two individuals on the lists. The judge excluded one individual because he was a known associate of the defendant's gang, and the defendant did not object. The judge again stated that people could be added to the list with twenty-four hours' advance notice. She also stated that an individual allowed in the court room could be removed for the remainder of the trial if he or she exhibited "any untoward behavior." There were specific security concerns at this point as the codefendants, Henrique Lopes and Jose Lopes, were out on bail and might encounter witnesses or other trial attendees in

---

[4] The protocol was to have two court officers present for each defendant.

the common areas of the court or during recesses.  The judge wanted to avoid any potential inappropriate mingling.

On June 12, 2006, the parties discussed safety issues relating to a cooperating witness who was scheduled to plead guilty to a related crime during the trial.  There were concerns about holding or transporting the defendant and codefendants near the cooperating witness.  There were also safety concerns about remanding the codefendants to jail during the trial, as there were many potential gang members in jail who might "at least consider, rightly or wrongly," that the two men were "involved in this series of violent episodes."  There also were ongoing issues with a key witness in the case against the codefendants, who were, at this point, being tried jointly with the defendant.  The Commonwealth eventually nol prossed the charges against Henrique Lopes and Jose Lopes on June 20, 2006, because this key witness could not be located.[5]

Several issues rose during the trial.  Before empanelling a jury on the first day of trial, the judge allowed the Commonwealth's motion to remove one of the persons on the

---

[5] On June 8, 2006, the prosecutor informed the judge that he had been unable to find or contact a key witness.  On June 13, 2006, the Commonwealth filed a motion to continue because it could not locate this witness.  This witness's family members were also out of contact with him and had reported their concerns for his well-being to the Boston police department.

defendant's trial attendees list because he had a record of a number of violent offenses.[6] The defendant did not object.[7]

On the second day of trial, there were concerns that the mother of one of the victims had suffered harm, as she had not been in communication with her family for over two days and was not present, though she had planned to attend the trial. The prosecutor also requested a warrant for Danny Fernandes, as he had not responded to subpoenas and his attorney could not locate him.

On the third day of trial, individuals associated with the defendant "stared down" a witness and the victim's family as they left the court room, requiring the judge to speak with defense counsel to reiterate that there was to be no intimidation outside the court room.

---

[6] Two people were also voluntarily removed by the Commonwealth from their own list "as a matter of equity" because they also had a "fairly extensive record of violent crimes." The protective orders in this case showed that potential witnesses had significant concerns for their safety should their testimony fall into the wrong hands before trial.

[7] Because of a motion in limine, the judge also was aware of threats made by the defendant's brother to a judge in an unrelated criminal matter. On March 1, 2002, the defendant was on trial for an unrelated crime and his brother, Odairson Fernandes, was present at the court house with Jose Lopes, Henrique Lopes, and Joasihno Fernandes. When Odairson Fernandes left the court room, a Boston police officer overheard him say, "Fuck him that faggot ass judge. I'm seventeen years old, he can't fucking tell me what to do." Joasihno Fernandes replied, "Fuck that judge, I'll call him. What's the number, I call and threaten his fucking ass, fuck him."

The approved attendees list was finalized on the third day of trial. The defendant did not object to this list, which included five of his family members and five of his friends.

On the fourth day of trial, the parties were supposed to conduct a videotaped deposition of the surviving victim, Carvalho, but he expressed "second thoughts" about participating and was ultimately not deposed.

On the fifth day of trial, the judge questioned DaSilva, the driver of the vehicle in which the victims were riding, about his desire to invoke his constitutional right not to testify. He repeatedly told the judge that he was "scared" to testify, because "[t]he courtrooms are here, they ain't in the streets. The police ain't going to be there every day for me on the streets." He denied receiving any specific threats, but maintained that he was "scared [for] his life" because of "all the things going on."

Dosouto, one of the victims of the April 17 shooting, testified on the fifth day of trial. On the sixth day of trial, the prosecutor notified the judge that Dosouto's family had found a portion of an extensive memo prepared by counsel for former codefendant Henrique Lopes in their mailbox on the day before Dosouto's testimony. The protective orders in this case were designed to prevent trial preparation material from being disseminated. The judge recognized that this raised an issue of

"fairly grave concern" and stated that she was "profoundly troubled" by the document's appearance, given the prior hearings on the need for protective orders.

On the eighth day of trial, the judge held a limited evidentiary hearing to discuss the disappearance of Danny Fernandes. The judge stated that she took "very seriously . . . any suggestion that the disappearance of a witness . . . in any manner can be connected to any collusion, intimidation, or the like." The judge ultimately granted the Commonwealth's motion for a continuance to give the Commonwealth time to find Danny Fernandes, stating that she was "[p]rofoundly troubled by the disappearance of these key witnesses."[8] The Commonwealth was unable to produce Danny Fernandes before the end of the trial.

The defendant contends, as he did in his motion for a new trial, that the trial judge's order requiring the use of an approved attendees list during the trial constituted a closure of the court room that violated his right to a public trial guaranteed by the Sixth Amendment. See Presley v. Georgia, 558 U.S. 209, 214 (2010); Commonwealth v. Rogers, 459 Mass. 249, 263

---

[8] That same day, at the Commonwealth's request, the judge allowed an individual who had been attending the trial, to be asked to leave the court room because of a history of incidents with Boston police detective who was scheduled to testify that morning. Rather than exclude the individual for only the detective's testimony and have to explain why to him, the judge excluded him from the morning session.

(2010), cert. denied, 565 U.S. 1080 (2011). We conclude that there was no such violation in these exceptional circumstances. As explained infra, the trial judge satisfied the necessary criteria to justify a partial closure of the court room given the extreme security concerns presented by the case, and the judge hearing the defendant's motion for a new trial (motion judge) properly denied that motion in a carefully considered decision.[9]

"[A]n open court room 'enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" Commonwealth v. Cohen (No. 1), 456 Mass. 94, 107 (2010), quoting Press-Enterprise v. Superior Court, 464 U.S. 501, 508 (1984). The right to a public trial is not absolute, however, "and in limited circumstances a court may bar spectators from certain portions of a criminal trial." Cohen (No. 1), supra.

In Cohen (No. 1), 456 Mass. at 111, we adopted the modified four-factor analysis established by the United States Supreme

---

[9] We proceed under a partial rather than a full closure analysis because the media, family members, and other individuals beyond the parties and counsel were present in the court room. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 110 (2010) (partial closure where family and other individuals were present during jury selection). Cf. Commonwealth v. Hardy, 464 Mass. 660, 664, cert. denied, 134 S. Ct. 248 (2013) (complete closure where court room cleared of spectators during jury selection).

Court in Waller v. Georgia, 467 U.S. 39, 48 (1984), to determine whether a partial closure violated a defendant's Sixth Amendment right to a public trial. First, "where a closure is partial, it is necessary to show a 'substantial reason' rather than an 'overriding interest' to justify the closing." Cohen (No. 1), supra. Second, the closure must be "no broader than necessary to protect [that] interest." Id. at 113, quoting Waller, supra at 48. Third, the judge must consider "reasonable alternatives to closing the proceeding." Cohen (No. 1), supra at 115, quoting Waller, supra. Fourth, the judge must make "findings adequate to support the closure." Cohen (No. 1), supra at 115, quoting Waller, supra. "In a partial closure context . . . a reviewing court may examine the record itself to see if it contains sufficient support for the closure, even in the absence of formal or express findings by the judge." Cohen (No. 1), supra.

If the closure does not satisfy these factors, "the error is deemed 'structural' in that prejudice is presumed and the defendant is entitled to a new trial." Commonwealth v. Maldonado, 466 Mass. 742, 748, cert. denied, 134 S. Ct. 2312

(2014), quoting Cohen (No. 1), supra at 118-119.[10]  We proceed by examining each of the Waller factors in turn.

a.  First Waller factor:  substantial reason.  In this case, the record showed a substantial reason to partially close the court room.  See Waller, 467 U.S. at 48; Commonwealth v. Maldonado, 466 Mass. at 752.  Here, the threat of violence was significant and the judge was properly focused on the need to protect everyone present, including the defendant and court staff.

Deference is owed to a trial judge's perception of the dangers of threats and intimidation in the court room. Maldonado, 466 Mass. at 753.  The trial judge must constantly monitor the tension in the court room, and its many different manifestations, and court room atmospherics are difficult to describe and evaluate on appeal.  See id.  Understandably, the judge here was "terribly concerned" about witness intimidation and trial safety issues.  In four separate incidents in June, 2003, before the defendant's indictment, several of the codefendants and their family members had had shots fired at them.  Codefendants and cooperating witnesses had expressed

_____

[10] Despite the fact that this trial took place eight years before, and without the benefit of, Commonwealth v. Maldonado, 466 Mass. 742, cert. denied, 134 S. Ct. 2312 (2014), the judge satisfied the requirements set out in that case.  See id. at 752.

grave concerns regarding retaliation.[11] The disappearances of important witnesses before the trial heightened the concerns.

Security issues also arose during the trial, further supporting the concerns about witness intimidation and trial safety. Different key witnesses were missing on the first and last day of trial. Arguable instances of gang intimidation occurred: individuals associated with the defendant "stared down" a witness and the victim's family as they left the court room, requiring the judge to speak with defense counsel to reiterate that there was to be no intimidation outside the court room. A witness who had been shot at in the April 28 incident told the judge that he was afraid to testify.

In addition to the case-specific security concerns, the judge noted that prior cases with similar gang overtones had presented security issues. The circumstances here are comparable to those addressed by the court in Maldonado, 466 Mass. at 742, another case of murder in the first degree involving a gang-related murder. There, we held that

> "when a member of a gang is alleged to have committed a
> shooting, there is a risk that others associated with the
> gang may attempt to intimidate witnesses to cause them to
> exculpate, or at least avoid incriminating, the accused.
> There is also the risk that animosity that may exist
> between rival gangs, or between those associated with the

---

[11] As mentioned, as a result of these concerns, protective orders were in place to restrict access to discovery materials, and the grand jury minutes were impounded.

accused and those associated with the victim, may spill over into the court room or the halls of the courthouse and lead to disruption of the court room."

Id. at 752-753.

Finally, the judge had to take into account the number of available court officers, and whether that number was sufficient in these trying circumstances.[12]  The record leading up to the trial showed the judge's significant security concerns that the feuding gang issues in this particular case could exacerbate the existing security challenges at the court house.

For all of these reasons, the first Waller factor was clearly satisfied.  See Waller, 467 U.S. at 48; Maldonado, 466 Mass. at 747-748.

b.  Second Waller factor:  no broader than necessary.  The second Waller factor requires us to determine whether the partial closure here, which resulted from an approved trial attendees list, was no broader than needed to accomplish its purpose.  See Waller, 467 U.S. at 48; Maldonado, 466 Mass. at 747.  The list was expressly designed to minimize the risk of witness intimidation and court room disruption.

---

[12] The judge communicated with the chief of court house security about her concerns.  She stated that she did not consider the court house to be a secure facility, and there was no guarantee that there would be enough court officers to secure both the court room and the common areas of the court house.

The list, as finalized by the judge, allowed friends and family of the defendant and codefendants to attend, as well as the press. The judge also provided for additions to the list with twenty-four hours' advance notice. The twenty-four hour advance notice was deemed necessary to allow all parties to identify potentially disruptive or dangerous attendees and allow court officers time to conduct criminal background checks. See Maldonado, 466 Mass. at 752. See also United States v. DeLuca, 137 F.3d 24, 32 (1st Cir. 1998) ("The recorded information was retained by the United States Marshal for use in determining whether the bearer had a criminal background or any connection with a defendant on trial such as might indicate a courtroom security risk"). Prior to trial, the judge excluded one gang member known to be an associate of the defendant. On the first day of trial, the judge allowed the Commonwealth's motion to remove one of the persons from the defendant's trial attendees list because he had a record of violent offenses. The defendant did not object in either instance. When the approved attendees list was finalized on the third day of trial, the defendant also had no objections to this list, which permitted five of his family members and five of his friends to attend.

We conclude that the measures the judge took were justified in these exceptional circumstances and no more intrusive than necessary. See Waller, 467 U.S. at 48; Maldonado, 466 Mass. at

748. "A judge need not wait for a witness to be intimidated, the court room to be disrupted, or a specific threat before taking appropriate steps to address the risk of such misconduct." Maldonado, supra at 753. A judge's responsibility for the safety, security, and integrity of the court room requires an acute attention and an appropriate response to the risks of violence and intimidation. Maldonado, 466 Mass. at 753. See Commonwealth v. Petetabella, 459 Mass. 177, 187 (2011) (trial judge has discretion to take into account special circumstances like security concerns to protect court room and its occupants). That response may be proactive as well as reactive. See Maldonado, supra. Some deference is owed to the trial judge's discretionary decisions in this regard. See id.

Extraordinary security concerns were obviously present here. The threat of violence, retaliation, and intimidation was manifest. See Commonwealth v. Ray, 467 Mass. 115, 124 (2014), overruled another grounds, Commonwealth v. Smith, 471 Mass. 161, 165 (2015), quoting Maldonado, 466 Mass. at 752 ("To impose a condition on entry, 'there must be an articulable risk of witness intimidation or court room disruption'"). Indeed, both the prosecution and defense had expressed at different times grave concerns about safety and security. The list and the exclusions were directly responsive to the significant identified risks of gang-related violence and intimidation.

United States v. Deluca, 137 F.3d 24, 35 (1st Cir.), cert. denied, 525 U.S. 874 (1998) ("screening procedure was reasonably designed to respond to [security] concerns"). Cf. Maldonado, supra ("condition on entry" must be "based on the special circumstances of the case"). Any exclusions were also appropriately based on an individualized inquiry attentive to, and directed at, the specific risk of violence and intimidation previously identified. Importantly, no one objected to the particular individuals excluded.

The defendant was able to put friends and family members on the list. Commonwealth v. Martin, 417 Mass 187, 195 (1994) ("typically, proceedings . . . may not be closed to the family and close friends of the defendant").[13] The defendant and the Commonwealth also could add to the list other individuals they wanted with twenty-four hours' advance notice. Finally, the press was expressly included on the list, and not in any way excluded.

Although we emphasize that there is a strong "presumption of openness" and access to our court rooms, we conclude that in these particularly dangerous circumstances the use of an

---

[13] Additionally, the defendant submitted, with his motion for a new trial, four affidavits from his cousins asserting that they were not permitted to enter the court room during the trial. There was, however, nothing in the record suggesting that the affiants or the defendant requested that they be on the list.

approved but amendable attendees list to exclude those presenting a demonstrated risk of violence and intimidation satisfies the requirement that the intrusion on the right to a public trial be no greater than is necessary. See generally Maldonado, 466 Mass. at 751-753 (sign-in and identification procedure appropriate given risk of gang-related witness intimidation). See also Deluca, 137 F.3d at 32 (risk of violence and intimidation justified screening and identification procedure to allow criminal background checks or inquiry of connection to defendant that might indicate court room security threat). Our conclusion here is reinforced by the fact that both the prosecution and defense had grave security concerns and the defendant did not object to the individuals excluded.

c. Third Waller factor: reasonable alternatives. The third Waller factor was satisfied because the judge took meaningful steps to consider reasonable alternatives to the approved attendees list. See Maldonado, 466 Mass. at 748, quoting Waller, 467 U.S. at 48. Here, the judge did not disregard the parties' original objections to her proposed partial closure mechanism and specifically sought input as to alternative ways to address her concerns that the gang overtones of this case could exacerbate preexisting security problems at the court house. See Commonwealth v. Wolcott, 77 Mass. App. Ct. 457, 465 (2010) (trial judge required to consider alternatives

and must not reject objections out-of-hand).  She asked counsel on several occasions to propose other reasonable ways to sufficiently address her underlying security concerns.  The Commonwealth discussed having extra Boston police officers present, and the judge considered increasing the number of court officers, but she expressed concern that the court lacked sufficient personnel, as court officers were needed in other sessions.  The judge also sought meaningful alternative solutions by discussing her concerns with her chief justice and the chief court officer, neither of whom could suggest a better alternative.  See Presley v. Georgia, 558 U.S. at 214 (trial courts obligated to consider alternatives even where none was offered by parties).

Although this case occurred eight years before Maldonado established the requirement of providing counsel time for interlocutory review, the judge specifically allowed time for the parties to seek review by a single justice of this court and expressed her desire for an appellate opinion on the matter. See Maldonado, 466 Mass. at 752.  None of the counsel for any of the defendant or codefendants offered any alternatives, and none of the parties sought interlocutory review.  We are satisfied that the trial judge took meaningful steps to consider reasonable alternatives before implementing the approved

attendees list, and that the motion judge did not err in so finding.

d. Fourth Waller factor:  adequate findings.  The final Waller factor was also satisfied here, because there were adequate findings in the record to support the closure.  See Maldonado, 466 Mass. at 748, quoting Waller, 467 U.S. at 48. Because this was a partial closure, we may consider the record "to see if it contains sufficient support for the closure, even in the absence of formal or express findings by the judge." Cohen (No. 1), 456 Mass. at 115.  As noted above, this case involved numerous requests for protective orders responding to codefendant and witness concerns that testifying might result in harm.  The minutes of the hearing on the defendant's bail status were impounded because of this fear.  The trial judge extensively discussed her security concerns and her reasoning for imposing the approved attendees list with the parties on multiple occasions prior to the trial.  Based on the substantial record of pretrial discussions, the disappearance of a key witness immediately prior to the defendant's trial, and the events that occurred during the defendant's trial, we are satisfied that the judge's findings adequately supported her decision to partially close the court room using an approved attendees list.  See Cohen (No. 1), supra at 116 (record must

allow reviewing court "to glean sufficient support for the extensive closure").

Exceptional facts justify the exceptional measures taken here. Although the presumption should always be toward openness, the partial closure here was a thoughtful, measured response to a dangerous and difficult set of circumstances. Given the legitimate security concerns present in this gang-related murder, we conclude that the Waller factors were satisfied and that the partial closure of the court room did not abridge the defendant's Sixth Amendment right to a public trial.

2. Sufficiency of the evidence. The defendant contends that the trial judge erred by denying his motion for a required finding of not guilty based on the Commonwealth's failure to present sufficient evidence of the defendant's presence at the scene of the shooting and shared intent. In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the Commonwealth and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted). Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).

We conclude that the Commonwealth presented sufficient evidence to convict the defendant of murder in the first degree on a joint venture theory. In order to prove murder in the first degree on the theory of joint venture, the Commonwealth

must prove beyond a reasonable doubt that "at the time the defendant knowingly participated in the commission of [murder in the first degree by deliberate premeditation, the defendant] had or shared the intent required for that crime." Commonwealth v. Zanetti, 454 Mass. 449, 470 (Appendix) (2009). The evidence need not be direct; circumstantial evidence and inferences drawn therefrom may be sufficient. Commonwealth v. Linton, 456 Mass. 534, 544 (2010), quoting Commonwealth v. Lao, 443 Mass. 770, 773 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). These inferences "need only be reasonable and possible and need not be necessary or inescapable. " Linton, supra, quoting Lao, supra.

Intent to kill may be inferred from the defendant's spoken words. See Commonwealth v. Fernandes, 427 Mass. 90, 95 (1998) (declarant's threat to "get" someone admissible as evidence of state of mind). The defendant's intent to kill individuals associated with Goncalves is sufficiently clear from his statements made eleven days before the shootings at issue here, when Goncalves had shot two of the defendant's friends. See id. A police officer heard the defendant say that "[s]omebody is going to die for this" fifteen to twenty times. The defendant later told Alves, "Don't worry about" the shooting, because the people responsible were "going to get it." Goncalves's association with the victims of the April 28 shooting is evident

by his presence at the scene that night in the aftermath of the shooting.

There is also ample circumstantial evidence to show that the defendant participated in shooting the victims. Shortly after DaVeiga and Carvalho were shot, the defendant was arrested in a white minivan, the vehicle that an eyewitness identified as involved in the shooting. See Commonwealth v. Gomes, 475 Mass. 775, 781-782 (2016) (evidence of defendant's knowing participation in shooting sufficient where defendant was involved in prior incident, was present at shooting, and fled with shooters, and where shell casings found in his automobile matched ballistics evidence from shooting).

The defendant was in the front passenger seat of the minivan, wearing Boston Celtics apparel, with Danny Fernandes in the driver's seat and Silva in the back seat. The eyewitness told the police that the shooting was perpetrated by two or three men, all wearing sports jerseys. He specifically noted that one of the men wore green and white, the colors of the Celtics. The eyewitness specifically identified Danny Fernandes and Silva as participants in the shooting, but the Celtics jersey-clad defendant was the only one in the van who matched the eyewitness's description of someone wearing green and white. See Commonwealth v. Watkins, 473 Mass. 222, 230 (2015) (evidence of defendant's involvement in shooting sufficient where he

wanted to fight victim, defendant's clothing and physical characteristics matched description of shooter, and automobile matched description of one seen shortly before shooting).

The minivan identified as involved in the shooting was rented by the defendant four days before the shooting, even though he owned a functioning Volkswagen. Police recovered a nine millimeter firearm in the van that matched the ballistics evidence from three spent shell casings found at the scene of the shooting. The firearm was hidden underneath a cup holder in the back of the van and wrapped in a page torn from a Volkswagen Golf manual, which was also in the van. Police also found two spent .25 caliber shell casings on the floor of the van.

We conclude that this circumstantial evidence was more than sufficient to show that the defendant participated in a joint venture with intent to murder the victims. See Gomes, 475 Mass. at 781-782; Watkins, 473 Mass. at 230. A rational trier of fact could have found beyond a reasonable doubt that the defendant knowingly participated in the commission of the charged crime with the required intent. See Commonwealth v. Rakes, 478 Mass. 22, 32 (2017).

3. Appropriateness of closing arguments. The defendant alleges two types of prosecutorial misconduct during closing arguments: improper burden-shifting and improper bolstering of and attacks on witness credibility. Specifically, the defendant

objected to the following part of the prosecutor's closing

argument, in which the prosecutor asked what the defendant

wanted the jury to believe:

> "What does the defense want you to believe in this case, ladies and gentlemen?  [The defendant's counsel] just gave a very eloquent closing argument.  But it's all coincidence.  It's all coincidence.  It's all speculation. What does he want you to believe?  Does the defense want you to believe that it just so happened that somebody used [the defendant's] minivan, somebody who also had the intent to kill, who had the motive for revenge?  What is he asking you to believe?  Is he asking you to believe that it's just coincidence that the murder weapon[14] is found in the car, that at 3:30 in the morning, as he continuously points out, near his house he happens to be in a passenger seat.  Is that coincidence?  Is that coincidence that his fingerprints are in there, that he's in there?  Is it coincidence that the other people involved in this case, [are friends] of his?  Is it coincidence that Carlos Silva is a friend of his, seen with him?  Danny Fernandes, friend, cousin?  Are those coincidences?  Those are not coincidences, ladies and gentlemen, that is overwhelming evidence of joint venture.  He was part of a team.  And it doesn't matter whether he pulled the trigger that caused the fatal shots.  It doesn't matter.  He was part of a team.  He shared the intent."

Because the defendant objected at trial, we review that

claim for prejudicial error.  Commonwealth v. Kater, 432 Mass.

404, 423 (2000).

The defense counsel focused his closing argument on the

circumstantial nature of the evidence presented by the

---

[14] The prosecutor mischaracterized the firearm as the "murder weapon" insofar as the recovered firearm in the minivan was not the firearm that fired the bullets recovered from the bodies of either of the victims.  The recovered firearm was, however, involved with the crime as it matched bullets found at the scene.

prosecution, arguing that the case was based on mere speculation. The prosecutor was entitled to point out the weaknesses of the defendant's case and "make a fair reply to the defendant's closing argument." Commonwealth v. Smith, 404 Mass. 1, 7 (1989). See Commonwealth v. Cassidy, 470 Mass. 201, 226 (2014). The prosecutor here responded to the defendant's closing argument by questioning whether the established facts seemed like coincidence. In closing argument, a prosecutor may argue "forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). In doing so, the prosecutor may not shift the burden of proof or argue that the defendant has any affirmative duty to prove his innocence. Commonwealth v. Johnson, 463 Mass. 95, 112 (2012), quoting Commonwealth v. Tu Trinh, 458 Mass. 776, 787 (2011). Nothing in the prosecutor's language addressing whether the evidence was a series of coincidences shifted the burden of proof or otherwise suggested that the defendant had any affirmative duty to put forward other witnesses or evidence. Rather than shifting the burden of proof, the prosecutor's language asking the jury to draw inferences based on the facts presented during trial was a fair response to the defendant's closing argument. See Smith, supra.

When the defendant objected to this portion of the closing argument asking what the defendant would have the jury believe, the judge responded that she would "make clear" where the burden lies. The judge's jury instruction appropriately highlighted the Commonwealth's sole possession of the burden of proof. The judge clearly instructed the jury on the Commonwealth's burden of the proof at the start of trial and immediately prior to closing arguments. See Kater, 432 Mass. at 423-424. There was no error.

Additionally, although not timely objected to at trial, the defendant contends that the prosecutor's use of rhetorical questions constituted both burden-shifting and improper vouching for the credibility of various witnesses. We review this claim for a substantial likelihood of a miscarriage of justice. Commonwealth v. Johnson, 429 Mass. 745, 748 (1999).

The rhetorical questions in the prosecutor's closing argument can be divided into two categories: those that speak to the evidence and which the defendant claims constituted improper burden-shifting, and those which speak to witness credibility and which the defendant claims constituted improper vouching.

The prosecutor's rhetorical questions are exemplified by the following language:

"And think about the premeditation.  Think about the decisions that [the defendant] made. . . .  [H]e gets on the [tele]phone to Jose Alves, [tells him] . . . [t]hey're going to get it bad.  A few days later, four days before this murder he rents a white minivan.  Why?  You can make reasonable inferences from the facts, ladies and gentlemen.  Why does he rent a white minivan four days before the murder, a couple days after saying, [t]hey're going to get it bad for what they did?  Because he's premeditating."

Rhetorical questions commenting on the evidence are not improper.  They may permissibly suggest that the defendant's defense is implausible based on the evidence and the reasonable inferences that can be drawn therefrom.  See Commonwealth v. Nelson, 468 Mass. 1, 13 (2014); Commonwealth v. Mattei, 90 Mass. App. Ct. 577, 582-583 (2016).  Asking rhetorical questions about why someone who owned a vehicle rented another one in the same city does not shift the burden of proof.  Rather it asks the jury to draw a reasonable inference.  See Nelson, supra; Mattei, supra.

The prosecutor similarly asked rhetorical questions in his closing argument regarding the motive and credibility of key witnesses including the eyewitness, the two cooperating witnesses (Alves and Nunes), DaSilva, and Dosouto.

A prosecutor may not vouch for the credibility of witnesses.  Commonwealth v. Penn, 472 Mass. 610, 627 (2015), cert. denied, 136 S. Ct. 1656 (2016).  In keeping with the prosecutor's ability to point out the weaknesses of the defendant's case and make a fair reply to his closing argument,

however, a prosecutor may address the witness's lack of motive to lie and do so by asking rhetorical questions relying on the evidence presented.  See Cassidy, 470 Mass. at 226; Commonwealth v. Smith, 450 Mass. 395, 408, cert. denied, 555 U.S. 893 (2008); Smith, 404 Mass. at 7.  The prosecutor's rhetorical questions about witness credibility were based on the evidence presented and largely responded to the defense counsel's own discussion of credibility in his closing argument.  The prosecutor addressed the witnesses' motives in testifying with rhetorical questions about what reasons someone may have to lie.[15]  This language was

---

[15] The prosecutor stated:

"[W]hat reason does [the eyewitness] have to lie?"

"Jose Alves . . . Did he seem like someone who was trying to say what the Commonwealth wanted?  Did he seem like someone who was lying, or did he seem like somebody who was scared, somebody who was part of the mix, as he told you?"

"Joao Nunes, what reason does he have to lie?  What is he really getting from this?"

"Jonathan DaSilva, how credible did he seem?  Again, his own friend is murdered right in front of him, another friend paralyzed for life right next to him.  But yet there he is, Oh, I don't remember anything."

"But then he actually wants you to believe, Amilton Dosouto does, that when he's shot, [the defendant] is calmly over him saying, Oh, it'll be all right.  Everything is okay.  Is that credible?  Of course not, ladies and gentlemen.  What's credible is what those Boston Police Officers told you, that he was frantic, that he was screaming, Someone is going to die for this.  Amilton Dosouto was credible in certain instances and not credible in others."

not improper.  See Smith, 404 Mass. at 7.  Further, the jury instructions clearly and repeatedly stated that closing arguments were not evidence.  As discussed in more detail infra, the jury instructions were also comprehensive as to the jury's power to determine for themselves the credibility of witnesses.  The jury are presumed to have followed these instructions.  See Cassidy, 470 Mass. at 226; Nelson, 468 Mass. at 13.  There was no error.

4.  Jury instruction on cooperating witness.  The defendant contends that the judge erred in the instructing the jury about cooperating witnesses.  Jose Alves and Joao Nunes testified for the prosecution pursuant to cooperating witness agreements, and copies of these agreements were submitted to the jury.  The cooperation agreements were partially redacted at the defense counsel's request.  The redacted cooperation agreement for Alves retained the following relevant language:

> "Mr. Alves agrees to make himself available for interviews with law enforcement officials and to testify completely and truthfully before any grand jury investigating the shooting death of Jose DaVeiga and shooting of Christopher Carvalho and at any subsequent hearings or trials relating to the same.  Mr. Alves agrees that he will neither withhold any information in his possession nor provide false information.  Mr. Alves acknowledges . . . that no law enforcement official has told him what to say -- other than to tell the truth -- in any interview or testimony that Mr. Alves is to give.
>
> " . . .

> "This agreement is also contingent upon Mr. Alves providing complete and truthful information and testimony before the grand jury and at any subsequent hearings or trials."

The redacted cooperation agreement for Nunes included functionally the same language with respect to promises of complete and truthful information and testimony.  Other references to truthfulness were redacted from both agreements.  The language presented to the jury, including the limited references to testifying truthfully, was agreed to by all parties.

The defendant requested that what he calls a truthfulness instruction be given to the jury as provided in Commonwealth v. Ciampa, 406 Mass. 257, 263-264 (1989).  The judge did not give the instruction that the defendant requested, but did give the following instruction:[16]

> "[Y]ou heard testimony from two witnesses, Jose Alves and Joao Nunes, who testified under an agreement with the prosecution.  You should examine those witnesses' credibility with particular care when you assess their believability.  Also, ladies and gentlemen, in assessing a witness' credibility you may consider any earlier statements made by the witness which you find differ from the testimony that the witness has given during the trial . . . .  If you find that the earlier statement differs from the way that the witness testified in court, then you may consider that the witness' believability has been adversely affected, or you may decide that it is not adversely affected.  But that earlier statement may be used

---

[16] The defendant's preferred instruction on truthfulness was not part of the record, but defense counsel's objection to the jury instructions at trial indicated that it was not given.

by you only for that purpose, that is to determine whether the witness is testifying credibly at this trial. You may also . . . in assessing credibility take into account a witness' frankness or lack of frankness while testifying, a witness' believability or lack of believability in the testimony . . . . You may also take into account the reasonableness or the unreasonableness of the witness' testimony. You may take into account the probability or the improbability of the testimony. You may take into account the accuracy of the witness' recollection and the degree of intelligence demonstrated by the witness." (Emphasis added.)

The defendant asserts that despite the judge's instruction that the jury take "particular care" in evaluating the credibility of cooperating witnesses, the jury instruction failed to conform to the requirements of Ciampa, because it failed to include language indicating that "the government did not know whether [the cooperating witness] was telling the truth" (citation omitted). Commonwealth v. Roman, 470 Mass. 85, 100 (2014). Because the defendant objected to the limited nature of the instruction, we determine whether there was prejudicial error. Kater, 432 Mass. at 423.

Where a witness testifies under a cooperation agreement with the government, the judge must "specifically and forcefully" instruct the jury to evaluate the witness's credibility with "particular care." Ciampa, 406 Mass. at 266. This is necessary to counteract the cooperation agreement's implied representation of credibility. Id. If the jury are made aware that the witness promised to tell the truth as part

of the cooperation agreement due to either trial testimony or submission of the cooperation agreements as exhibits, the judge should additionally "warn the jury that the government does not know whether the witness is telling the truth." Commonwealth v. Meuse, 423 Mass. 831, 832 (1996). Nevertheless, "failure to so instruct, standing alone, is not reversible error. . . . It is only where the prosecutor has vouched for the witness or suggested having special knowledge by which he or she can verify the witness's testimony that such an instruction must be given to avert reversible error" (citation omitted). Roman, 470 Mass. at 100.

Here, the judge gave the particular care instruction but did not give the instruction the defendant requested concerning that the agreement was conditioned on truthfulness.[17] This was not, however, reversible error, as there was no vouching by the prosecutor. See Roman, 470 Mass. at 100. Although the prosecutor reminded the jury that Alves and Nunes had testified

---

[17] The jury instruction to evaluate the credibility of cooperating witness testimony with "particular care" also immediately followed instructions to take into account a witness's interest, bias, or prejudice with regard to the case when evaluating credibility and were followed by further instructions on evaluating witness demeanor, reasonability, and motive. These instructions specifically alerted jurors to the permissibility of considering a witness's motive for testifying. See Commonwealth v. Ciampa, 406 Mass. 257, 264 (1989) (jury instructions must "focus the jury's attention on the incentives that could have influenced [the witness's] testimony").

pursuant to cooperation agreements, his rhetorical questions did not indicate any special knowledge of their truthfulness as witnesses.  See Commonwealth v. Washington, 459 Mass. 32, 44 n.21 (2011).

Moreover, there was no danger of prejudice here, as the testimony of Alves and Nunes did not concern the April 28, 2003, shooting of the victims but rather the defendant's motivation for the shooting.  This testimony was merely duplicative of other testimony, particularly the defendant's repeated statements to a Boston police officer at the scene of the prior April 17, 2003, shooting of Alves and Dosouto that "[s]omeone was going to die for this."  For all these reasons, the defendant was not prejudiced by the failure to give the instruction the defendant requested.

5.  Review under G. L. c. 278, § 33E.  We have reviewed the record pursuant to G. L. c. 278, § 33E, and discerned no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial.  Accordingly, we decline to exercise our authority.

Conclusion.  For the reasons stated above, we affirm the defendant's convictions.  We also affirm the denial of the defendant's motion for postconviction relief.

So ordered.